COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-237-CV

DONALD E. KILPATRICK & PAMELA      APPELLANTS

GALE JOHNSON, TRUSTEE

V.

TIMOTHY S. KILPATRICK, KEVIN K. APPELLEES

KILPATRICK, KILPATRICK LIMITED 

PARTNERSHIP, KILPATRICK 

VENTURES, LTD., SHAMROCK 

INVESTMENTS, L.L.C., KSR 

FAMILY, LTD., KMK FAMILY, LTD., 

BPC HOLDING CORP., PESCOR, INC., 

AND BERRY PLASTICS CORPORATION

------------

FROM THE 43RD DISTRICT COURT OF PARKER COUNTY

------------

OPINION

------------

I.  Introduction

In three issues, Donald E. Kilpatrick asserts (1) his standing to prosecute his claims regarding his ownership of certain stock, (2) the status of Trustee Pamela Gale Johnson as a proper party to a lawsuit involved in this appeal, and (3) alternatively, the proper filing of an amended pleading concerning Pamela Gale Johnson, which the trial court refused to recognize.  We affirm.

II.  Factual and Procedural Background

A.  Business History

This is the case of the squabbling siblings.  In 1966, Donald L. Kilpatrick (“Donald L.”), the father of the Kilpatrick litigants, purchased Pescor Plastics, Inc. (“Pescor”).  Donald L. was chief executive officer and chairman of the board until 1996.  When Donald L. purchased Pescor, the company primarily manufactured insulated couplings and wire splicers, but it gradually diversified into other areas.  By 2000, the company’s primary product was plastic cups, sold to businesses such as 7-11, Pepsi-Cola, Coca-Cola, and Wal-Mart. 

Donald L.’s son, Donald E. Kilpatrick (“Don”), became an attorney and assisted his father with legal issues affecting the company.  While Don’s brothers, Kelly, Tim, and Kevin, worked for Pescor after graduating from college, Don did not.  Kevin started as a production worker in 1974 and worked his way to CEO by 1997.  Tim also worked through the company ranks, beginning as a sales representative in 1985, and later becoming president in 1997.  Additionally, Kelly was an officer and director.  As a result of their work for the company, Kelly, Kevin, and Tim each received Pescor stock. 

Don claimed that he had a close familial and business relationship with Tim and Kevin, trusting them as brothers, friends, confidants, and business partners.  He stated that it was his expectation that they treat him with the utmost fairness and candor because he was both a member of the family and a member of the family business.  Don claimed that this relationship gave rise to the existence of fiduciary duties owed to him by Kevin and Tim.

Don asserted that prior to September 26, 1997, Kevin and Tim engaged in a systematic pattern of verbal, physical, and mental abuse of their brother Kelly as part of Kevin and Tim’s plan to gain control of Pescor.  Don alleged that on or before September 26, 1997, Kevin and Tim, who owned and/or controlled two-thirds of the Kilpatrick Ventures Limited (“KVL”), Kilpatrick Limited Partnership (“KLP”), Shamrock Investments, L.L.C. (“Shamrock”), and the voting stock of Pescor, threatened that if Kelly, also a stockholder, did not assign his interests in these entities to them, they would insure that Kelly (a) was removed from his position with Pescor, (b) was deprived of his salaried compensation, and (c) received nothing for his interests.  As a purported result of this intimidation, on or about September 26, 1997, Kelly executed an Ownership Interest Purchase Agreement and Severance and Release Agreement, wherein Kelly sold his interests to Kevin and Tim and agreed to relinquish his position with Pescor. 

B.  Stock Transactions

Prior to June 1, 2000, the company books reflected that Don owned 1,000 non-voting shares of Pescor common stock (approximately 11.38%). Don asserted that he was unaware that this stock had been assigned to him and was unaware that he owned any issued stock in Pescor until Kevin and Tim approached him in April or May of 2000 and offered to buy the stock from him. Until that time, Don asserted, he expected to own twenty percent of Pescor because Donald L. had told all of his children that he was going to leave the company to them in equal shares upon his death. 

Evidently, 1,000 shares of Pescor stock had been given to Don in two separate transactions.  First, 100 shares had been given to each of the children, including Don, in 1973.  Although Don asserted he had no knowledge of receiving 100 shares of Pescor at that time, Tim and Kevin claimed that Don did know of his ownership of these 100 shares.  Second, Don claimed that he was gifted 900 additional shares of stock in 1993, again without his knowledge. While this stock ownership was reflected on the books and records of Pescor, Don continuously asserted that he was never informed of the gifts of stock nor were stock certificates evidencing this stock ownership ever issued to him.  The company never paid any dividends or sent any correspondence to Don that would have informed him of his status as a shareholder.  Tim and Kevin do not agree with Don’s lack-of-knowledge argument.
(footnote: 1) 

C.  Bankruptcies

On December 13, 1990, Don filed for bankruptcy protection under Chapter 11 in the Bankruptcy Court for the Southern District of Texas, Houston Division (“1990 Bankruptcy”).  Don claimed that he did not know of his ownership interest in Pescor at that time and therefore did not list ownership of such stock in his bankruptcy filings; instead Don asserted that he was aware only of a twenty percent expectancy interest in Pescor.  According to Don, he informed the Trustee, Pamela Gale Johnson (“Trustee”), of the expectancy interest several times during his meetings with her, and the Trustee informed him that an expectancy interest in a closely-held family corporation was not something that the bankruptcy estate had any interest in pursuing. 

As required by federal law, Don filed sworn schedules outlining his assets and liabilities.  However, Don disclosed no interest in Pescor on his schedules, based, he says, on the statement made by the Trustee.  Particularly, Don made the following sworn (non)disclosures, under the penalty of perjury.

1990 Schedule B-2--Personal Property

t. Stock and interests in incorporated and unincorporated companies (itemize separately)

-0-

1990 Schedule B-3--Property Not Otherwise Scheduled

b. Property of any kind not otherwise scheduled. Debtor has contingency fee agreements to represent individuals in personal injury type lawsuits.  Until these cases are tried and monies collected these agreements have no present value

-0-

The 1990 Chapter 11 bankruptcy was converted to a Chapter 7 bankruptcy on January 24, 1991, and discharged on September 17, 1992.  However, the Chapter 7 bankruptcy filing and estate, Case No. 90-07141, appears to still be open and has been the subject of ongoing and recent activity by the Trustee. 

Five years later, on February 6, 1995, Don filed for bankruptcy protection under Chapter 13 in the Bankruptcy Court for the Southern District of Texas, Houston Division (“1995 Bankruptcy”).  Just as in the 1990 Bankruptcy, Don did not disclose what he asserts he believed to be a one-fifth expectancy interest in Pescor, nor did Don disclose as an asset the shares of stock that had been assigned to him on the Pescor books of which he has urged he was unaware. This bankruptcy was dismissed on December 31, 1995. 

Nine months later, on September 27, 1996, Don filed for bankruptcy protection a third time, again under Chapter 13 in the Bankruptcy Court of the Southern District of Texas, Houston Division (“1996 Bankruptcy”).  As in the prior bankruptcies, Don did not disclose the asserted expectancy interest in the family business or his ownership shares of which he was allegedly unaware. This third bankruptcy filing included asset schedules and amended schedules that again failed to mention an interest in Pescor.  Like the 1995 Bankruptcy, the 1996 Bankruptcy was dismissed. 

According to Don, after finally becoming aware of his share interest, he amended his prior bankruptcy filings in August 2003 to reflect his ownership of the 1,000 shares of Pescor stock and the pendency of this lawsuit, but no creditors were harmed from his failure to disclose the stock in his bankruptcy schedules because the creditors in all three bankruptcies were paid in full, with interest.  However, after the filing of Don’s amended schedules on August 13, 2003, the bankruptcy estate paid over $56,879.29 towards Don’s unsecured claims pursuant to the bankruptcy court’s order of April 26, 2004.  

D.  Business Difficulties and Stock Sale

According to Tim and Kevin, Pescor was experiencing financial difficulties in 1999 and 2000.  Raw material costs, especially petroleum (from which plastic products are made), were steadily rising, while competition from larger companies kept prices the same.  At this time Pescor was trying to gain an exclusive contract with Coca-Cola for a product known as the “Contour Cup” that Tim had designed, but Pescor lacked the funds necessary to cover the front-end operational expenses that manufacturing the cup would require.  To address these problems, Pescor drew heavily on a $4 million line of credit it had established with Frost Bank in February 1999.  As a result, Pescor’s debt on the line of credit rose to $1.8 million by December 31, 1999, and to $2.78 million by March 2002. 

Tim and Kevin asserted that to resolve Pescor’s impending financial crisis, Kevin sought credit from various financial institutions, such as GE Capital, Texas Chase Bank, and Frost Bank.  But, because he and Tim had personally guaranteed Pescor’s existing lines of credit at Frost and the company’s manufacturing equipment collateralized a separate $3.3 million note with Frost, they needed additional collateral to secure any further financing.  According to Tim and Kevin, Texas Chase Bank informed Kevin that any loan would likely require personal guarantees from them and would need to be secured by Pescor’s outstanding common stock. 

According to Don, shortly prior to June 1, 2000, Tim and Kevin approached him to solicit the sale of his Pescor common stock and represented to him that in order for Pescor to survive, Pescor was required to borrow money for capital expenditures from an undisclosed lender, and Pescor needed his stock in order to pledge the stock to the lender.  Don also asserted that at the time of the solicitation, the reason for the purchase proferred by Tim and Kevin was not the principal reason for their desire to purchase the stock, nor was it even a valid reason since his stock could have been pledged on any borrowing by Pescor without his sale or assignment of the stock.  Don further contended that when Kevin and Tim sought to buy his stock they failed to disclose to him one or more of the following material facts:  

a. that Bruce Simms of BPC,
(footnote: 2) in approximately February 2000, had flown to Fort Worth from Indiana to meet with Kevin and Tim, that he asked them if they would entertain an offer to sell to or merge with BPC, and that Kevin and Tim told him that they would entertain such an offer;

b. that Pescor immediately thereafter entered into a Confidentiality Agreement with BPC, who signed the agreement as “Potential Buyer,” for the purposes of exchanging financial documents and discussing a sale or merger of Pescor;

c. that Pescor provided extensive financial statements and other confidential information to BPC pursuant to the Confidentiality Agreement;

d. that BPC had made one or more previous offers and indications of interest for the purchase of Pescor in recent years, including a specific offer to purchase the company as recently as Spring, 1997;

e. that Pescor and BPC had had other recent preliminary and/or general discussions about a purchase or merger with Pescor;

f. that Pescor had entered into one or more confidentiality agreements with BPC to facilitate previous sale or merger discussions; 

g. that Kevin and Tim had commissioned an appraisal of Pescor, one purpose of which was to provide information on how much to offer Don and others for their Pescor stock, which most recent appraisal valued the company at approximately $9,600,000.00, or Don’s apparent 11%+ ownership of the Company at approximately $1,056,000.00;

h. that Kevin and Tim had initiated a so-called “family stock plan” to issue voting stock and non-voting stock, but principally to place control of Pescor in their hands; 

i. that Pescor had been working on a lucrative contract with Coca-Cola Company for some time and that Pescor was on the “cusp” of signing such contract (such contract was consummated shortly after Don’s stock was purchased); and

j.  that they intended to resell Don’s Pescor stock to BPC as soon as possible for a huge profit, which they did.

Don alleged that one or more of these omissions, culminating in the profitable sale, [“j” above], were the true reasons for Kevin and Tim’s desire to purchase the Pescor stock from Don; therefore, the affirmative statement made by Kevin and Tim that they needed to buy Don’s stock in order to borrow money was a materially false and incomplete statement upon which Don relied to his detriment.  Don claimed that he would not have sold his 1000 shares of stock to Pescor for $400,000 had he known any of the above facts.
(footnote: 3)  According to Don, at the time of the purchase, Tim and Kevin, as officers and directors of Pescor and the holders of the voting stock of Pescor, knew that the Pescor stock was worth far in excess of the amount for which Don sold his interest.  Don asserted that not only did Kevin and Tim affirmatively fail to disclose to him that his stock had value far in excess of the amount paid to him, but Tim and Kevin affirmatively misrepresented the reasons for which they caused Pescor to acquire his stock, as previously recounted. 

Further, Don claimed that (1) at a date prior to May 14, 2000, Kevin and Tim transferred, or caused Pescor to issue, certain stock interests in Pescor to KVL, KSR, and KMK; (2) after procuring the shares of Pescor stock, Tim and Kevin implemented a scheme to place the Pescor stock and other assets beyond the reach of their creditors, including Don; (3) Tim and Kevin transferred, or caused Pescor to issue, 49.75% of the stock of Pescor to KVL, 25.09% to KSR, and 22% to KMK; (4) the foregoing transfers were made with intent to hinder, delay, and defraud the creditors of Kevin and Tim, including Don; (5) KVL, KSR, and KMK were merely the alter egos of Tim and Kevin; and (6) alternatively, such entities were used as shams to perpetrate a fraud and/or were organized as mere tools or conduits, and/or were mere instrumentalities and/or were entities resorted to as means of evading existing legal obligations. 

E.  Business Acquisition

Tim and Kevin pointed out that the communications they had on behalf of Pescor with BPC in 2000 were not the first BPC-Pescor acquisition discussions in which the competing companies had engaged.  Over the years, BPC had periodically made offers to purchase Pescor in the past, but Tim, Kevin, and their father had not agreed.  Don claimed that he believed that Tim, Kevin, and Pescor entered into negotiations with BPC and/or subsidiaries to sell Pescor to BPC prior to June 1, 2000,
(footnote: 4) and furthermore, BPC conspired to achieve the lowest possible purchase price by dealing solely with Tim and Kevin rather than the original shareholders.  Don alleged that Tim, Kevin, and Pescor failed to disclose this material fact to Don, and that when Tim and Kevin caused Pescor to purchase Don’s stock, they knew that Pescor’s stock had a value substantially in excess of that paid to Don for his stock.  On or about May 14, 2001, Tim, Kevin, KVL, KSR, and KMK sold what was alleged to be all of the outstanding stock of Pescor to BPC for an aggregate consideration of $22 million, plus an additional $3 million if certain financial targets were met in the future (the “BPC Transaction”).
(footnote: 5)  The per-share consideration received by Tim, Kevin, KVL, KSR, and KMK pursuant to the BPC Transaction substantially exceeded the per-share consideration received by Don for his interest in Pescor by several times.

On the other hand, Tim and Kevin painted a different picture and gave a different account of the events leading to the sale.  They contend that in March 2000, BPC again asked to review Pescor’s financial records to determine if it might want to make an offer; BPC conducted a review, but was then silent for over three months.  On June 24, 2000, BPC offered to purchase Pescor.  At the time BPC made this offer, Pescor remained unable to achieve additional financing.  Further complicating matters, Pescor was still attempting to gain an exclusive contract with Coca-Cola; but Coca-Cola informed Pescor in the summer of 2000 that it required an annual production of over 300 million units, greatly exceeding Pescor’s 80 million unit capacity.  Thus, to win the contract, Pescor would have to purchase over $8 million in additional equipment.  Under such circumstances, the parties negotiated toward the sale of Pescor from June until September.  Despite Pescor’s mounting financial pressures, no agreement could be reached, and BPC withdrew its outstanding offer in late September. 

Meanwhile, Tim and Kevin maintained, Pescor reached its limit on the Frost line of credit.  To avoid ruin, Tim and Kevin secured a $2 million traditional loan from Frost in October 2000, the proceeds of which were applied to the line of credit to free up working capital.  However, Frost was unwilling to extend further financing.  Tim and Kevin were also unable to secure alternative financing from other sources. 

According to Tim and Kevin, on November 17, 2000, BPC made another run at gaining Pescor (and its exclusive Coca-Cola contract, which had been signed in August).  This time, however, BPC offered to merge.  While the offer was rejected, the parties continued to negotiate.  On December 21, 2000, a letter of intent was finally signed.  Following the December agreement, BPC and Pescor experienced several setbacks that almost ruined the proposed merger.  For example, BPC’s board of directors refused to approve the deal in March 2001, and the transaction was temporarily dead.  Thereafter, the parties spent months attempting to salvage the deal.  Finally, on May 21, 2001, Pescor merged with a BPC subsidiary.  By this time, a year had passed since Tim and Kevin had purchased Don’s stock.

III.  Procedural Background

On September 21, 2001, Don and Kelly filed a lawsuit in the 43rd
 District Court of Parker County, Texas, styled 
Donald E. Kilpatrick and Kelly L. Kilpatrick v. Timothy S. Kilpatrick, et al. 
for monetary damages resulting from the alleged previously described conduct.  Kelly’s claims were thereafter voluntarily dismissed. 

The Kilpatrick/Shamrock parties
(footnote: 6) asserted in their first motion for summary judgment, filed on May 28, 2003, that Don was judicially estopped from bringing claims in connection with the sale of the stock, which was not disclosed as an asset in Don’s prior bankruptcy filings.  This motion for summary judgment was denied. 

On January 3, 2005, the Kilpatrick/Shamrock parties filed their Supplemental Motion for Traditional Summary Judgment and for the first time alleged that the stock was the property of the bankruptcy estates created by Don’s bankruptcy filings, and therefore only the bankruptcy trustees, not Don, had standing to prosecute Don’s claims.

In the January 14, 2005 affidavit filed with the trial court, the Trustee stated that she had known of the litigation since July 2003 and had given her verbal consent for Don to pursue the claims on behalf of the Bankruptcy Estate. 

On January 17, 2005, Don filed notice that “the Bankruptcy Estate and Trustee in Case No. 90-07141-43-7 [have] an interest in this lawsuit and [have] authorized the undersigned lead firm, Pennington, Hill & Baker, LLP to prosecute this action herein on behalf of the Bankruptcy Trustee and Estate, to the extent of the Trustee’s interest in such claims.”

On January 24, 2005, the trial court held a hearing on the Kilpatrick/Shamrock parties’ no evidence and traditional motions for summary judgment and their supplemental motion for traditional summary judgment. 

On April 1, 2005, the trial judge sent the parties notice of his ruling granting the Kilpatrick/Shamrock parties’ judgment as a matter of law because “the only person or persons with standing to pursue the remedies sought by Don would be the Trustee(s).” 

On April 11, 2005, Don and the Trustee filed their Fourth Amended Original Petition, with the Trustee as a named party to the lawsuit. 

On April 12, 2005, the trial judge signed an order granting summary judgment on the basis that Don lacked standing to prosecute the claims.  At the same time, the trial judge declined to sign an order approving the filing of the plaintiffs’ fourth amended petition. 

On May 10, 2005, Don filed his motion for new trial, arguing that the grounds presented to the trial court by the Kirkpatrick/Shamrock parties were insufficient as a matter of law to support the summary judgment granted in their favor.  Don asserted that the trial court’s order granting summary judgment improperly extinguished two separate and distinct claims: (1) the claims of the 1990 Bankruptcy Estate relating to 100 shares of Pescor stock asserted by the Trustee in the name of the debtor, Donald E. Kilpatrick; and (2) the claims of Donald E. Kilpatrick relating to the sale of 900 shares of Pescor stock.

On June 23, 2005, by way of a letter to counsel, the trial judge denied Don’s motion for new trial.  The trial judge held that the summary judgment was granted without prejudice to the rights of the Trustee; in the event the Trustee pursued the claims the subject of this case, those claims would be dealt with separately.  The trial judge further held that no pleadings on file sought affirmative relief on behalf of the Trustee.  This appeal resulted.  

In the notice of appeal, both Don and the Trustee purport to challenge the trial court’s judgment.  The Kilpatrick/Shamrock parties have filed a motion to strike the Trustee’s appeal, claiming that the Trustee was never a party to the underlying case and therefore has no right to appeal the trial court’s judgment.  We now turn to the parties’ complaints on appeal.

IV. Standard of Review  

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. 
 Tex. R. Civ. P. 166
a(c); 
Sw. Elec. Power Co. v. Grant, 
73 S.W.3d 211, 215 (Tex. 2002); 
City of Houston v. Clear Creek Basin Auth.,
 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.  
Sw. Elec. Power Co., 
73 S.W.3d at 215.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant’s favor.  
Valence Operating Co. v. Dorsett, 
164 S.W.3d 656, 661 (Tex. 2005).  Evidence that favors the movant’s position will not be considered unless it is uncontroverted. 
 Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,
 391 S.W.2d 41, 47 (Tex. 1965). 

The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant’s cause of action or defense as a matter of law. 
 Clear Creek Basin, 
589 S.W.2d at 678.  A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.  
IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason, 
143 S.W.3d 794, 798 (Tex. 2004).  Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. 
 Centeq Realty, Inc. v. Siegler, 
899 S.W.2d 195, 197 (Tex. 1995).  When reviewing a summary judgment granted on specific grounds, the summary judgment can only be affirmed if the ground on which the trial court granted relief is meritorious. 
 Cates, 
927 S.W.2d at 625-26. 

Don appears to argue that the standard of review for a plea to the jurisdiction is proper for the trial court’s order, that is, a de novo standard of review where “[d]ismissing a cause of action for lack of subject matter jurisdiction is proper only when it is impossible for the plaintiff’s petition to confer jurisdiction on the trial court.”  
TRST Corpus, Inc. v. Fin. Ctr.
, 9 S.W.3d 316, 320 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).  While that may be true when a plea to the jurisdiction is filed, as is customarily the case in, for example, Texas Tort Claims Act cases, in this case a traditional motion for summary judgment was granted, so the standard of review will be that for such motions.  Further, even when jurisdiction is challenged by way of a plea to the jurisdiction and a factual dispute is alleged, “the trial court reviews the relevant evidence to determine if a fact issue exists” and the “summary judgment standard of proof”
 is utilized.  
Tex. Dept. of Parks & Wildlife v. Miranda,
 133 S.W.3d 217, 227, 228 (Tex. 2004).

V.  Standing

In his first issue, Don asserts that he had standing to pursue his claims concerning the sale of the 900 shares of stock, thus the trial court erred by dismissing his suit based on a lack of standing. 

A. Jurisdiction

It is axiomatic that a court must have subject matter jurisdiction in order to adjudicate a dispute, and without it, the merits of a case may not be reached.  
Douglas v. Delp
, 987 S.W.2d 879, 884 (Tex. 1999); 
Carter v. Carter
, 21 S.W.3d 441, 443 (Tex. App.—San Antonio 2000, no pet.)
.  Subject matter jurisdiction is essential to the authority of a court to decide a case.  Standing is implicit in the concept of subject matter jurisdiction; it is never presumed and cannot be waived.  
Tex. Ass’n of Bus. v. Air Control Bd.
, 852 S.W.2d 440, 443-44 (Tex. 1993).

B. Who Holds the Claims?

The first issue to be determined
 
is who holds the right to pursue claims related to the 900 shares of Pescor stock: Don or the bankruptcy trustee?
(footnote: 7)  
Both parties have conceded that of the 1000 shares of Pescor stock in Don’s name, 100 shares were part of the 1990 bankruptcy estate, and therefore the Trustee has standing to assert the claims regarding those shares.
(footnote: 8)  Therefore, this issue revolves around the remaining 900 shares.  Don argues that he holds title to the 900 shares of Pescor stock and is entitled to assert claims arising from the sale of that stock to Pescor.  On the other hand, the Kilpatrick/Shamrock parties argue that the 900 shares remain with the Trustee of the 1995 bankruptcy estate because undisclosed assets remain with the trustee when a bankruptcy case is dismissed.
(footnote: 9) 

When a debtor files a bankruptcy petition, all of his property, including all legal and equitable interests, instantly becomes part of the bankruptcy estate.  
Antonov v. Walters, 
168 S.W.3d 901, 904-05 (Tex. App.—Fort Worth 2005, pet. denied).
  When property passes into the bankruptcy estate, the debtor loses all right, title, and interest in the property.  11 U.S.C.A. § 541(a) (West 2004). When this occurs, a debtor also loses standing to pursue claims held by the bankruptcy estate.  
Douglas, 
987 S.W.2d at 882.
  The trustee, as the representative of the estate, gains exclusive standing to assert any claim arising from the violation of rights associated with the estate.  
Id.  
Here, Don asserts that because the 1995 and 1996 bankruptcy proceedings were dismissed before a final disposition was made, the 900 shares of Pescor stock revested with him, giving him standing to bring this claim.  We disagree.

When a bankruptcy case is dismissed, the property of the estate revests in the entity in which the property was vested immediately before the commencement of the case.  11 U.S.C.A. § 349(b)(3).  The practical effect of a dismissal is to “undo” the bankruptcy case by restoring all property rights to the person to whom they belonged immediately before the initiation of the case. 
Kunica v. St. Jean Financial, Inc., 
233 B.R. 46, 53-55 (S.D.N.Y. 1999).  
But there is an important caveat to this rule on which we base our decision: upon the dismissal of a bankruptcy case, the estate’s assets revest in the debtor only if the assets were disclosed to the bankruptcy court when the debtor scheduled his assets. 
 Id
.  
Here, Don filed two Chapter 13 bankruptcies in 1995 and 1996.  As a result of these filings, all assets he held became the property of the bankruptcy estates.  
See 
11 U.S.C.A. § 541(a). 
 Don did not disclose any interest in Pescor stock within his bankruptcy schedules as required pursuant to 11 U.S.C.A. § 541(a).  Therefore, when the 1995 bankruptcy was dismissed, the 900 shares of Pescor stock remained with the bankruptcy estate.

In making our decision, we have carefully considered the importance of the disclosure requirement in bankruptcy cases.  
Full disclosure of the debtor’s assets is
 absolutely required when a bankruptcy case is first initiated, and the debtor is required to provide a complete schedule of his assets to the trustee.
  In re Coastal Plains, Inc.,
 179 F.3d 197, 207-08 (5th Cir. 1999), 
cert. denied
, 528 U.S. 1117 (2000).  Full disclosure is the most 
critical element of the bankruptcy system because 
without it the basic system of marshaling assets and the distribution of proceeds to creditors would be an impossible task.  
Best v. Metlife Auto & Home Ins. Co., 
793 N.Y.S.2d 682, 686-87 (N.Y. Sup. Ct. 2004);
 In re Coastal Plains, Inc.,
 179 F.3d  at 207-08.  Despite the fact that the law is abundantly clear in its requirement of full disclosure, Don attempts to persuade this court that his ownership of 900 shares was unknown rather than undisclosed
, and because he did not know of the shares he could not disclose them.  By arguing that his nondisclosure stemmed from his lack of knowledge rather than from an intentional omission, Don essentially asks the court to differentiate between intentional and unintentional nondisclosure.  We decline to recognize such a distinction.  
Full disclosure is crucial to the integrity of bankruptcy proceedings; thus, we hold that 
all nondisclosures of assets, whatever the reason, must be treated the same.  To hold otherwise would encourage a procedural end-run around the disclosure requirements.  It would provide the opportunity for debtors to assert ignorance about ownership of an asset only to conveniently discover ownership of the asset at a later time.
(footnote: 10)  Hence, differentiating between intentional and unintentional disclosure would undermine the Bankruptcy Code’s requirement of nondisclosure, and we hold that all instances of nondisclosure of assets will be treated the same.  It is for this reason that 
we accept the reasoning of 
Kunica
 and hold that 
only disclosed assets will be revested to the debtor upon the dismissal of a bankruptcy proceeding.  

While this may seem like a harsh result for debtors whose nondisclosure stemmed from unknown assets, such a debtor is not without remedy.  Under existing law, an undisclosed asset remains in the estate until the debtor reopens the proceeding, discloses the asset, and allows the trustee to make a fully informed decision regarding its proper administration. 
 Stein v. United Artists Corp., 
691 F.2d 885, 893 (9th Cir. 1982); 
see also Munters Corp. v. Locher,
 936 S.W.2d 494, 496 (Tex. App.—Houston [14th Dist.] 1997, writ denied).  This obligation is especially important when the trustee or debtor learns of the existence of property through other means.
  Munters Corp., 
936 S.W.2d at 496. 
 If a debtor fails to take these steps once the bankruptcy proceedings are closed, those assets not properly scheduled will not revest in the debtor.  
Id. 
 Thus, it is incumbent upon the debtor to have the bankruptcy case reopened and the ownership of the claim determined.  
Id.  
Here, the 900 shares of stock remained with the bankruptcy estate upon the dismissal of the 1995 bankruptcy because Don did not disclose the assets when the proceedings began.
  
In order for Don to have regained title to the assets, and therefore have standing in this action, he was obligated to reopen the 1995 bankruptcy, disclose the asset, and have the trustee make an informed decision regarding the proper administration of the asset. 
 See id. 
at 
496.  There is no evidence that Don took the prescribed steps to reopen the estate and request the revesting of the stock.  As such, the 900 shares of undisclosed Pescor stock remained with the bankruptcy estate, and Don has no standing to assert claims arising from the sale of the 900 shares.

Don attempts to distinguish 
Kunica
 from the case at bar by pointing to the fact that the bankruptcy proceeding in 
Kunica
 was a chapter eleven proceeding while the two bankruptcies at issue in this case are chapter thirteen proceedings.  Despite the difference in proceedings, the issue pares down to whether or not the asset was disclosed.  Full disclosure of assets is required regardless of the chapter under which the bankruptcy was brought.  
See Best, 
793 N.Y.S.2d at 686-87.  
As such, we agree that the law established in 
Kunica
 and followed in 
Best
 applies to all bankruptcy proceedings: estate assets can revest in the debtor only if the assets were disclosed to the bankruptcy court. 
 Id. 

Because Don failed to disclose the 900 shares of Pescor stock at the commencement of the 1995 and 1996 bankruptcy proceedings, the assets did not revest in him upon dismissal of the suits.  Furthermore, because Don was obligated to reopen the 
1995 bankruptcy 
in order to regain an interest in the shares, and because he failed to take such steps, Don lacks standing to prosecute claims for the sale of the 900 shares.  Accordingly, we overrule Don’s first issue.  

VI.  Status of the Trustee

In his second issue, Don argues that the Trustee became a party to the lawsuit through Don, that is, that the Trustee pursued the claims of the 1990 Bankruptcy Estate in the name of Don, the Debtor, as authorized by the bankruptcy court. 

Despite the joint efforts of Don and the Trustee to demonstrate that the Trustee joined the suit and pursued the claims of the estate under Don’s name, such efforts were not enough to confer standing upon Don.  As previously discussed, standing goes to the court’s jurisdiction.
  Douglas,
 987 S.W.2d at 882.  
As such, standing must exist at the time the action was filed.  
Banks v. Nat’l Collegiate Athletic Ass’n, 
977 F.2d 1081, 1085 (7th Cir. 1992),
 cert. denied
, 508 U.S. 908 (1993); Ball v. Nationscredit Fin. Servs. Corp., 207 B.R. 869, 871 (N.D. Ill. 1997)
.  As determined earlier, Don lacked standing to initiate the suit when he filed the case on September 21, 2001.
(footnote: 11)  Because he lacked standing at the time the action was filed, the suit must be dismissed even if he later acquired an interest sufficient to support standing.  
See Ball, 
207 B.R. at 871
;
 see also Mitchell Excavators, Inc. v. Mitchell
, 734 F.2d 129, 131 (2d Cir. 1984) 
(the debtor must always obtain permission from the bankruptcy court before proceeding with the case).  We would point out that even when the Trustee attempted to intervene in this suit, such action would not convey standing upon Don. 
 See Fuller v. Volk
, 351 F.2d 323, 328 (3d Cir. 1965)
 
(intervention by one with standing does not retroactively cure a jurisdictional standing defect); 
In re Dygert, 
232 B.R. 155, 157 (Bankr. D. Minn. 1999) (holding that “intervention will not be permitted to breathe life into a ‘nonexistent’ lawsuit”).

Don also contends that the Trustee pursued the claims of the 1990 Bankruptcy Estate in the name of the debtor as authorized by the bankruptcy court.  
He 
asserts that when a debtor is given permission to pursue claims of a bankruptcy estate, those claims are almost always brought in the debtor’s name, not in the trustee’s name.  Although the 
general rule holds that a debtor lacks standing to assert a claim relating to the bankruptcy estate, a debtor may bring a claim after bankruptcy has been filed only if the trustee has abandoned the claim or the debtor has sought and been granted specific approval to bring the suit in his name.
(footnote: 12) 
 See Dallas Cabana, Inc. v. Hyatt Corp
., 441 F.2d 865, 868 (5th
 Cir. 1971).  
The debtor must always obtain permission from the bankruptcy court before proceeding with the case.
  See Mitchell Excavators, Inc.
, 734 F.2d at 131.

Here,
 
in response to the Appellees’ motion for summary judgment
, 
Don filed an affidavit with the trial court in which the Trustee stated that she had given oral permission for Don to pursue the claims on behalf of the bankruptcy estate.
(footnote: 13)  The Trustee then filed an application with the bankruptcy court for an order that would permit the firm she hired to proceed on the estate’s behalf in the suit.  The bankruptcy court granted the order, permitting the claims of the estate to be pursued under her or the debtor’s name.  Although the Trustee did in fact obtain permission from the bankruptcy court that the claims could be asserted in Don’s name, this order was not granted until March 15, 2005.  Don initiated the suit on September 21, 2001.  There is no record that Don obtained permission from the bankruptcy court before proceeding with the case as the law requires.  
See id. 
 
As a result, the general rule still applied: standing is determined on the date of filing, and as a debtor who forfeited all rights upon filing for bankruptcy, Don lacked standing to initiate the current proceeding.
  
See Dallas Cabana, Inc.,
 441 F.2d at 868.
 

Don did not obtain court approval to proceed with the case before he initiated the suit, nor was the Trustee’s permission sufficient to confer standing upon him.  As such, he lacked standing to bring the claims on behalf of the bankruptcy estate.  Consequently, we overrule Don’s second issue. 

VII.  Did the Trial Court Improperly Refuse to Recognize the Appellant’s Amended Pleading?

In Don’s third and final issue, he argues that he asserted the claims of the bankruptcy estate by filing an amended petition naming the Trustee as a party plaintiff, that this petition was on file prior to the trial court’s order of summary judgment, and that the trial court improperly refused to recognize the amended pleading. 

Don asserts that the trial court abused its discretion by refusing to grant his motion to file a fourth amended petition.  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.  
See Carpenter v. Cimarron Hydrocarbons Corp., 
 98 S.W.3d 682, 687 (Tex. 2002); 
Downer v. Aquamarine Operators, Inc., 
701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied, 
476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Downer, 
701 S.W.2d at 241-42. 

We have previously established that Don lacks standing to assert any of the claims brought in the initial suit.  It would appear that this fourth amended petition is his attempt to, once again, avoid the preclusive effects of his lack of standing.  After the trial court sent a letter stating its intent to grant summary judgment in favor of the Kilpatrick/Shamrock parties as a matter of law because of Don’s lack of standing, Don submitted a motion asking the court to permit a fourth amended petition.  It appears that Don sought to file such a petition so that he could add the Trustee, a party with standing, as an attempt to deter the court from rendering summary judgment.  This seems to have been the sole purpose of the amendment.  Even if we construe the pleadings liberally in favor of Don, we find that paragraphs one through sixty-four were identical to the content of the third amended petition, which is currently the live and applicable pleading in this suit.  
See Miranda, 
133 S.W.3d at 226.
  
The only difference in the fourth amended petition is the last paragraph (sixty-five), which, if construed liberally, was the Trustee’s attempted intervention into this suit.
 
 Thus, the only real difference between the third amended pleading and the proposed fourth amended pleading was that Don added a named party to the lawsuit in the fourth amended pleading.  No standard plea in intervention or recognizable pleading by the Trustee herself was filed. 

It is evident that the trial court recognized that there were no substantive differences contained in the proposed pleading that would have altered the outcome of the case.  For even if this pleading were permitted, and the Trustee were named as a party to the lawsuit, this would not have changed the fact that Don lacked standing at the time the suit was filed.  And as we previously stated, the intervention by one with standing does not retroactively cure a jurisdictional standing defect. 
 See Fuller
, 351 F.2d at 328
.  
We held that Don suffered no harm from the trial court’s decision not to allow the amended pleading and therefore hold that the trial court did not improperly refuse to recognize the fourth amended petition.  As such, there was no abuse of discretion as Don alleged. 
 
We overrule Don’s final issue
.

VIII.  Kilpatrick/Shamrock Parties’ Motion to Strike Trustee’s Appeal

Generally, an appeal is available only to parties of record.  
Continental Cas. Co. v. Huizar
, 740 S.W.2d 429, 430 (Tex. 1987); 
Jernigan v. Jernigan
, 677 S.W.2d 137, 140 (Tex. App.—Dallas 1984, no writ).  
Because we have held that the trial court did not abuse its discretion by 
refusing to recognize the fourth amended petition that merely added the Trustee’s name as a plaintiff, we also conclude that 
the Trustee was not a party to this lawsuit in the trial court.  Accordingly, 
she cannot now appeal the trial court’s judgment.
(footnote: 14)  We therefore grant the Kilpatrick/Shamrock parties’ motion to strike the Trustee’s appeal.

However, nothing in this opinion precludes the Trustee from pursuing the 

issues presented in this case in a separate cause of action. 

IX. CONCLUSION

Having overruled all three of Don’s issues, we affirm the trial court’s judgment.

BOB MCCOY

JUSTICE

PANEL A: LIVINGSTON, WALKER, and MCCOY, JJ.

DELIVERED: October 5, 2006

FOOTNOTES
1:
Tim and Kevin claim that the following testimony shows Don’s knowledge of his stock ownership:

A.  Right.  Now, you understand I don’t dispute that I understand that I had ownership --

Q.  I understand.

A.  --and ownership rights . . . 

Q.  That’s right, sir.  With respect to your order - just to make sure we’re all on the same page again, you understand that you had an ownership right or a beneficial interest in [Pescor] of 20 percent from sometime around 1966 until --

A.  From the inception of the company.

2:
BPC Holding, Inc. is the parent company of Berry Plastics Corporation, one of Pescor’s competitors.

3:
At the time of the sale, Don was asked to sign an affidavit of lost certificate because he did not possess certificates evidencing either block of stock.  The purchased stock was alleged by Tim and Kevin to be non-voting stock, so that Don would never have been required, or given notice, to attend any shareholder meetings. 

4: On or shortly before June 1, 2000, Tim and Kevin approached Don with an offer for him to sell his shares. 

5:
In connection with the BPC Transaction, Pescor merged with a newly created subsidiary of BPC called Pescor, Inc.  Pursuant to the BPC Transaction, Pescor, Inc. emerged as the surviving entity.  Accordingly, for the purposes of the underlying lawsuit, Pescor, Inc. is the successor to Pescor. 

6:
Kilpatrick/Shamrock parties include Tim Kilpatrick; Kevin Kilpatrick; Kilpatrick Limited Partnership; Kilpatrick Ventures, Ltd.; Shamrock Investments, L.L.C.; KSR Family, Ltd.; KMK Family, Ltd.; BPC Holding Corp.; Pescor, Inc.; and Berry Plastics Corporation.

7:
Interestingly, if Tim and Kevin’s position that the Trustee owns the stock in question is correct, then they could not have purchased the stock from Don and resold it, presumably leading to a Pandora’s Box of consequences.

8:
Don admitted in his brief that he lacked standing to pursue some of the claims at issue when the lawsuit was filed: “At the filing of the initial lawsuit, . . . the Trustee had standing to assert claims arising from the sale of the 100 shares of Pescor stock.”

9:
As will be discussed, the stock remained with the 1995 bankruptcy trustee and therefore could never have vested with the 1996 trustee; andsince the shares were not assigned to Don until after 1990, they could never have been vested in the 1990 bankruptcy trustee. 

10: We are not suggesting that this scenario occurred here.

11:
Don admitted in his brief that he lacked standing to pursue some of the claims at issue when the lawsuit was filed: “At the filing of the initial lawsuit, . . . the Trustee had standing to assert claims arising from the sale of the 100 shares of Pescor stock.”

12:
There is no contention that the Trustee abandoned the claim by not filing suit, nor is there any evidence that Don asked the court to compel the Trustee to abandon the suit.  Thus, we need only look to see whether Don petitioned the court for permission to pursue the claim on his own.

13:
The Trustee confirmed within her January 2005 affidavit that she did not learn of the pending lawsuit until July 2003.  She gave Don her verbal consent to pursue the claims on behalf of the Bankruptcy Estate sometime after that. 

14:
A nonparty’s right to appeal has been recognized in certain circumstances in which the appellants were deemed to be parties under the doctrine of virtual representation or were otherwise bound by the judgment and when their privity of estate, title, or interest appeared from the record of the cause below.  
Jernigan
, 677 S.W.2d at 140.  Such is not the case here; 
the trial court’s judgment does not prevent the Trustee from filing her own lawsuit to assert the
 estate’s claims.