ASSOCIATION RESOURCES, INC. *v.*
JOSEPH J. WALL
(SC 18316)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille and McLachlan, Js.*

* The listing of the justices reflects their seniority status on this court as of the date of oral argument.

Argued May 27—officially released August 31, 2010

*Edward T. Lynch, Jr.*, for the appellant (plaintiff).

*Paul H. D. Stoughton*, with whom, on the brief, were *Jennifer Katz* and *Joshua Chapps*, for the appellee (defendant).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether a bonus payment, which is required to be paid under the express terms of an executive's employment contract and calculated in accordance with a formula set forth therein, is a "wage" as defined by General Statutes § 31-71a (3).[1] The plaintiff and counterclaim defendant, Association Resources, Inc. (defendant), appeals[2] from the judgment of the trial court awarding the defendant and counterclaim plaintiff, Joseph J. Wall (plaintiff), damages in the amount of $282,827 on his counterclaim alleging that the defendant's failure to pay the plaintiff certain bonuses constituted a breach of his employment contract and the Connecticut wage statutes (wage statutes), General Statutes § 31-71a et seq.[3] On appeal, the defendant claims that the trial court

---

[1] General Statutes § 31-71a (3) provides: " 'Wages' means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation . . . ."

[2] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Because only the counterclaim is at issue in this appeal, we, like the trial court, hereinafter refer to Wall, the defendant in the original action, as the plaintiff, and Association Resources, Inc., the plaintiff in the original action, as the defendant.

We also note that the plaintiff brought this counterclaim against the president of the defendant, Peter Berry. The trial court concluded, however, that the claims as to Peter Berry individually "[i]n effect" had been withdrawn

improperly: (1) concluded that the bonuses claimed by the plaintiff are subject to the wage statutes; (2) calculated the bonuses owed; (3) rejected its special defenses of accord and satisfaction and substitution of contract; and (4) denied its motion to dismiss the counterclaim for lack of standing and judicial estoppel on the basis of the plaintiff's failure to list the wage claims as assets in two bankruptcy petitions. We disagree and, accordingly, we affirm the judgment of the trial court.

The record reveals the following facts, which are either undisputed or were found by the trial court, and procedural history. The defendant is a Connecticut corporation that provides administrative, marketing and technical services to numerous nonprofit professional and trade associations. The defendant's president and founder is Peter Berry, whose wife, Suzanne Berry, serves as executive vice president. In August, 2002, the defendant hired the plaintiff as a consultant to upgrade its computer system. Due to the growth of the defendant, and the Berrys' desire to spend more of their working time on client development, the defendant hired the plaintiff shortly thereafter to serve as its chief operating officer, with the title of senior vice president. The plaintiff worked initially in accordance with a letter of intent. This was followed by an employment contract that was executed in July, 2003 (employment agreement), and was set to expire on August 6, 2005. Schedule 3.2 of the employment agreement, which set forth the plaintiff's responsibilities, intended the plaintiff to spend 70 percent of his working time overseeing the defendant's information technology, financial and

as a result of the plaintiff's concession "that there is no claim against [him] because he was not the sole authority of [the defendant]." The trial court rendered judgment for Peter Berry, and the plaintiff did not appeal from that judgment. Accordingly, all references herein to the defendant are to Association Resources, Inc.

human relations divisions, and specifically developing a Digital Group to provide enhanced Internet and mail services for its clients, with the remainder of his time devoted to other administrative and strategic responsibilities.

Under the employment agreement, the plaintiff's base salary was $86,000, with 5 percent annual increases to be given on August 7, 2003, and August 7, 2004.[4] Under § 2.4 of the employment agreement, the plaintiff also received a $100 monthly office allowance for items such as remote access and telephone charges.[5] Additional compensation for the plaintiff was furnished pursuant to § 2.2 of the employment agreement, which provides in relevant part: "[The plaintiff] shall be entitled to receive commissions and bonuses calculated as follows:

\* \* \*

"(b) [The plaintiff] shall be paid bonuses on February 15, 2004; August 15, 2004; February 15, 2005 and; August 6, 2005 based upon the overall profitability of the Digital Group from July 1, 2003 through June 20, 2005. Said bonus amounts shall be calculated based upon the 2003–04 Digital Group budget as set forth in Schedule 2.2 and the 2004–05 budget which will be established in the [s]pring of 2004. [The plaintiff's] bonus shall be equal to the annual income received by the Digital Group less $75,000 for fiscal year 2003–2004 and $80,000

---

[4] Under § 2.3 of the employment agreement, the plaintiff also received a variety of insurance, retirement and paid leave benefits.

[5] Section 2.4 of the employment agreement provides in relevant part: "The [defendant] shall reimburse [the plaintiff] in accordance with its standard expense reimbursement procedures upon presentation by [the plaintiff], from time to time, of an itemized account for such expenditures, for business-related expenditures such as parking and mileage reimbursement. A monthly office allowance of [$100] will be paid to [the plaintiff] for remote access to the [defendant] for telephone charges, fax, high-speed modem service and miscellaneous office expense."

for fiscal year 2004–2005, and less the commissions paid pursuant to paragraph (a) above. [The plaintiff's] bonus will be determined after the Digital Group's expenses are paid for the preceding six month period and after [the defendant] receives its six months pro-rated income. [The plaintiff] shall then receive the remaining profit. . . ."[6]

Following some initial disagreement concerning the bonus amount owed under the employment agreement, namely, the percentage of the Digital Group's net profit to which the plaintiff was entitled, on February 15, 2004, the defendant ultimately acceded to the plaintiff's request for a first bonus in the amount of $28,883.[7] The parties' relationship then grew increasingly strained and, by the spring of 2004, the Berrys had expressed concerns with the plaintiff's performance as an administrator, informed him that the bonus provisions in the employment agreement were "not working for them," and sought to change the focus of his employment to more technical work, with a fixed salary of $90,000 plus

---

[6] Other bonus and commission provisions of § 2.2 of the employment agreement, not at issue in this appeal, provided: "(a) [The plaintiff] shall be paid a commission equal to 30 [percent] commission of the net receipts of [the] Digital Group services from commercial, corporate, non-association entities from July 1, 2003 through August 6, 2005. The Digital Group is defined as the department within the [defendant] that is responsible for desktop publishing, web site design/management, and the mail center. 'Net sales' shall mean gross sales less refunds. The commission shall be paid on November 15, 2003; February 15, 2004; May 15, 2004; August 15, 2004; November 15, 2004; February 15, 2005; May 15, 2005; and August 6, 2005. . . .

"(c) On June 30, 2004 and June 30, 2005 [the plaintiff] shall be paid a bonus in connection with revenues originated by [the plaintiff's] efforts, for transaction-based services (as opposed to the acquisition of full service association management clients of the [defendant]) and clients not previously serviced by [the defendant] ('[q]ualifying [r]evenues'). Said bonus shall be determined after a client time analysis is conducted and the profit margin is determined. Said bonuses shall be equal to 33 [percent] of the [q]ualifying [r]evenues received by the [defendant] less other expenses dedicated to said project."

[7] This first bonus is not at issue in this appeal.

discretionary bonuses. To that end, in July, 2004, the defendant proposed to amend the employment agreement by deleting the bonus provisions of § 2.2 in their entirety. The plaintiff refused, however, to sign that proposal.

The defendant subsequently did not pay the plaintiff his second bonus payment, for the second half of the 2003–2004 fiscal year, which was due on August 15, 2004 (second bonus). The parties did not discuss the bonus issue again until November 15, 2004, when the defendant proposed to pay the plaintiff a second bonus in the amount of $8727, despite the plaintiff's claim that he was owed $58,329. Peter Berry then told the plaintiff that he no longer was willing to discuss the issue and, the following morning, he presented the plaintiff with a letter on behalf of the defendant signed by himself and Suzanne Berry. In the letter, the defendant presented the plaintiff with two options: "(1) Sign the requested contract amendment; accept [its] offer of an [$8000] bonus; and leave open the possibility of extending your contract that expires in August, 2005; or (2) [r]equire [it] to pay you the bonus that you are seeking thereby acknowledging that your contract will not be renewed next year." The plaintiff declined to accept either option, but directed the payroll office to pay him $8000 toward the amount that he believed that he was owed.[8] The plaintiff testified that he took the $8000 because he had been experiencing personal financial difficulties, of which the Berrys were aware.

Subsequently, on December 13, 2004, the defendant exercised its termination option under § 4.1 of the

[8] Originally, the plaintiff had directed the payroll office to issue him a check for $8927, but, in December, 2004, he remitted $927 to the defendant so that the bonus would conform to the $8000 amount that the defendant had proposed in November.

employment agreement,[9] gave the plaintiff the required sixty days notice and renewed its offer of a different position at a salary of $90,000, excluding bonuses. The plaintiff accepted that offer and signed a new employment contract on January 3, 2005 (2005 contract), reasoning that he needed a job, but nevertheless claimed entitlement to the bonus, on the basis of the Digital Group's performance for the first half of the 2004–2005 fiscal year, that would be due on February 15, 2005, under the terms of the original employment agreement

[9] Section 4.1 of the employment agreement provides in relevant part: "(a) Except as otherwise provided in subsections (c) and (d) hereof, this [a]greement and the employment of [the plaintiff] hereunder as an employee of the [defendant] shall terminate upon the earliest to occur of the dates specified below:

"(i) the close of business the last day of the [t]erm;

"(ii) the close of business on the date of [the plaintiff's] death;

"(iii) the close of business on the date the [defendant] delivers to [the plaintiff] a written notice of its election to terminate his employment for 'cause' (as defined in [§] 4.2 below);

"(iv) the close of business on the date sixty (60) days after written notice shall have been delivered by the [defendant] to [the plaintiff] of its intention to terminate [the plaintiff's] employment because the [defendant] has determined that such termination is in the best interests of the [defendant] and such termination is not for cause, death or disability;

"(v) the close of business on the date one hundred twenty (120) days after written notice shall have been delivered by [the plaintiff] to the [defendant] of his election to terminate his employment with the [defendant]; or

"(vi) the close of business on the date which is thirty (30) days after the [defendant] delivers to [the plaintiff] written notice of termination due to [the plaintiff's] disability. . . .

"(c) For purposes hereof, upon termination of this [a]greement, and the employment of [the plaintiff] as provided in [§] 4.1 (a), all obligations and liabilities of the parties hereto shall cease and be of no effect except for those liabilities and obligations provided for in [a]rticle II, to the extent the [defendant] has not fully discharged its obligations thereunder, and in [a]rticle V hereof.

"(d) For purposes of clauses (i), (ii), (iii), and (vi) of [§] 4.1 (a) above, [the plaintiff] shall be relieved of his duties and shall vacate his office and the [defendant's] premises on the date specified in such clauses. [The plaintiff] shall be relieved of his duties and shall vacate his office and [the defendant's] premises on the expiration of the sixty (60) day period following notice required by clause (iv) and on the expiration of the one hundred twenty (120) day period following notice required by clause (v), unless requested by the [defendant] to cease his duties and vacate the [defendant's] premises during either of said notice periods."

(third bonus), prior to the 2005 contract taking effect. See also part IV B of this opinion. Through the remainder of 2005, the plaintiff's role with the defendant was reduced to the management of the Digital Group.

In June, 2005, the plaintiff filed a claim with the wage and workplace standards division of the department of labor (department), seeking to collect the unpaid second and third bonuses. The parties' relationship deteriorated even further over the summer and, by August, 2005, while the plaintiff was away on vacation, he learned that the defendant had locked him out of remote access to its computer servers. The plaintiff then sent a letter to Peter Berry indicating that he took the lockout as a sign he was no longer employed by the defendant, and he did not subsequently return to his job.

In August, 2005, the defendant initiated this action seeking damages and injunctive relief against the plaintiff, claiming, inter alia, that he had breached both noncompete provisions of the employment agreement and his fiduciary duty by: (1) not returning to work after his vacation; and (2) promoting his former business and seeking a new job. The plaintiff then filed an answer generally denying the claims in the complaint and raising numerous special defenses, along with the counterclaim at issue in the present appeal seeking money damages, twice the full amount of the unpaid wages, attorney's fees and costs, and a prejudgment remedy on the ground that the defendant's failure to pay the plaintiff his bonuses and the $100 monthly office allowance violated the employment agreement and the wage statutes, specifically General Statutes §§ 31-71b,[10] 31-

[10] General Statutes § 31-71b provides in relevant part: "(a) Each employer, by himself, his agent or representative, shall pay weekly all moneys due each employee on a regular pay day, designated in advance by the employer, in cash, by negotiable checks or, upon an employee's written request, by credit to such employee's account in any bank which has agreed with the employer to accept such wage deposits.

"(b) The end of the pay period for which payment is made on a regular pay day shall be not more than eight days before such regular pay day,

71c,[11] 31-71e[12] and 31-73.[13] Thereafter, the defendant withdrew the original complaint after the parties were

provided, if such regular pay day falls on a nonwork day, payment shall be made on the preceding work day. . . ."

[11] General *Statutes* § 31-71c provides: "(a) Whenever an employee voluntarily terminates his employment, the employer shall pay the employee's wages in full not later than the next regular pay day, as designated under section 31-71b, either through the regular payment channels or by mail.

"(b) Whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the business day next succeeding the date of such discharge.

"(c) When work of any employee is suspended as a result of a labor dispute, or when an employee for any reason is laid off, the employer shall pay in full to such employee the wages earned by him not later than the next regular pay day, as designated under section 31-71b."

[12] General *Statutes* § 31-71e provides: "No employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer and recorded in the employer's wage record book, or (4) the deductions are for contributions attributable to automatic enrollment, as defined in section 31-71j, in a retirement plan described in Section 401(k), 403(b), 408, 408A or 457 of the Internal Revenue Code of 1986, or any subsequent corresponding internal revenue code of the United States, as from time to time amended, established by the employer." We note that § 31-71e was amended in 2008; see Public Acts 2008, No. 08-118, § 1; those amendments have no bearing on this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[13] General *Statutes* § 31-73 provides: "(a) When used in this section, 'refund of wages' means: (1) The return by an employee to his employer or to any agent of his employer of any sum of money actually paid or owed to the employee in return for services performed or (2) payment by the employer or his agent to an employee of wages at a rate less than that agreed to by the employee or by any authorized person or organization legally acting on his behalf.

"(b) No employer, contractor, subcontractor, foreman, superintendent or supervisor of labor, acting by himself or by his agent, shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment. No such person shall require, request or demand that any person agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to

able to resolve the issues raised therein, leaving only the counterclaim pending. See also footnote 3 of this opinion.

Subsequently, the proceedings were stayed pursuant to 11 U.S.C. § 362 and Practice Book § 14-1 because of the plaintiff's filing of an application for relief in the United States Bankruptcy Court for the District of Connecticut (Bankruptcy Court) under chapter 13 of the United States Bankruptcy Code. The stay was terminated after the Bankruptcy Court dismissed the plaintiff's petition for relief.

After the plaintiff filed a revised counterclaim that named Peter Berry personally as a defendant,[14] the defendant moved to dismiss that revised counterclaim for lack of subject matter jurisdiction, contending that the plaintiff both lacked standing to assert the claims raised therein and was judicially estopped from raising those claims. The trial court, *Hon. Richard M. Rittenband*, judge trial referee, denied the defendant's motion to dismiss the counterclaim, a proceeding that is discussed in greater detail in part I of this opinion.

With leave of the court, the plaintiff then filed an amended counterclaim, citing General Statutes § 31-72[15]

---

obtain employment or continue in employment. A payment to any person of a smaller amount of wages than the wage set forth in any written wage agreement or the repayment of any part of any wages received, if such repayment is not made in the payment of a debt evidenced by an instrument in writing, shall be prima facie evidence of a violation of this section.

"(c) The provisions of this section shall not apply to any deductions from wages made in accordance with the provisions of any law, or of any rule or regulation made by any governmental agency.

"(d) Any person who violates any provision of this section shall be fined not more than one hundred dollars or imprisoned not more than thirty days for the first offense, and, for each subsequent offense, shall be fined not more than five hundred dollars or imprisoned not more than six months or both."

[14] The trial court, *Graham, J.*, had granted the plaintiff's motion to cite in Peter Berry as a counterclaim defendant. See also footnote 3 of this opinion.

[15] General Statutes § 31-72 provides: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to

as authorizing an award of attorney's fees and twice the full amount of his unpaid wages. The defendant responded by filing an answer and asserting numerous special defenses, including that: (1) the plaintiff had failed to state a claim under the wage statutes because the bonuses were not "wages" as defined therein; (2) the court lacked subject matter jurisdiction; (3) the doctrine of judicial estoppel precluded the plaintiff from pursuing the counterclaim personally; (4) the doctrine of accord and satisfaction resolved the plaintiff's claim for the second bonus; (5) the plaintiff had waived his claim to the second bonus; and (6) the January, 2005 revised employment agreement operated as an accord and satisfaction that waived the plaintiff's right to any further bonus compensation, including the third bonus.[16]

31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action. The Labor Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received, had payment been made in a timely manner. In addition, the Labor Commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages, payments due to an employee welfare fund or arbitration award, and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. The commissioner shall distribute any wages, arbitration awards or payments due to an employee welfare fund collected pursuant to this section to the appropriate person."

[16] The defendant also raised the following special defenses not at issue in this appeal: (1) the plaintiff failed to bring this counterclaim under § 31-72 in a timely manner; (2) the plaintiff's claim against Peter Berry individually was time barred; (3) the plaintiff failed to bring the counterclaim properly in a representative capacity; (4) the defendant had paid all the bonuses to which the plaintiff was entitled; (5) § 31-73 does not provide for a private right of action; and (6) the statutes cited by the plaintiff do not fall within the ambit of § 31-72 or are not applicable to the bonus claims.

During the subsequent trial to the court, Judge Ritten-band heard testimony from the plaintiff, Peter Berry and Suzanne Berry. The trial court first credited the testimony of the plaintiff over that of the Berrys, finding that the plaintiff was "honest, candid and forthright," and that the Berrys, "when they realized that the [employment agreement] required them to pay [the plaintiff] more in bonuses than they anticipated, when they realized that the [employment agreement] they had prepared was less favorable to them than they thought, tried every which way to avoid paying their obligations. That's why they insisted on [the plaintiff] signing [the 2005 contract] which did not include provisions for bonuses. Further, aware that [the plaintiff] had financial problems, they pressured him to take less than the bonuses he was due with the implied threat that if he continued to contest the amount of the bonuses, his employment would be terminated. Peter Berry made it very clear that there was to be no further discussion of bonuses."

The trial court then concluded that, under § 2.2 (b) of the employment agreement, the plaintiff was entitled to receive a second bonus of $50,329, and a third bonus of $67,397. See also part III of this opinion. The trial court also determined that the plaintiff was entitled to $1700 in unpaid office allowances. The trial court then rejected each of the special defenses, noting that it already had addressed the standing and judicial estoppel claims in ruling on the defendant's motion to dismiss, and that the plaintiff had conceded that he did not have a viable claim against Peter Berry individually. See footnote 3 of this opinion. The trial court also disagreed with the defendant's contention that the plaintiff's claims were barred by the doctrine of accord and satisfaction, crediting the plaintiff's testimony that he "took the [partial payment of] $8000 because he was in financial trouble and in no way agreed to that being

the full satisfaction of his claim for bonus compensation." The trial court then found that the 2005 contract, executed in January, 2005, did not mention bonus compensation and, therefore, did not waive the plaintiff's claims for any bonuses earned prior to that contract.

The trial court then determined that the plaintiff was entitled to relief under the double damages and attorney's fees provisions of § 31-72.[17] The trial court concluded that the bonuses in this case were wages as defined by § 31-71a (3) because § 2.2 (b) of the employment agreement set forth a formula by which the bonus would be calculated, which was an "other basis of calculation" under § 31-71a (3) because "it is tied into achievement of better work performance on the part of [the plaintiff] to obtain a higher profit which results in a higher bonus." Thus, the trial court found that the defendant had violated § 31-71e by improperly withholding the plaintiff's wages, and § 31-73 by pressuring the plaintiff to "sign a new contract and . . . modify the original contract with at least the implied threat of termination of employment." Thus, the trial court rendered judgment for the plaintiff in the amount of $282,827, consisting of $237,152 in damages, or double the unpaid bonuses plus the $1700 unpaid office allowance and statutory interest in the amount of $45,675.[18] This appeal followed.[19]

---

[17] The trial court observed that "[m]otive, good or bad faith are irrelevant to the enforcement of [the wage] statutes. They are clear on their face, and nowhere is the motive of the entity withholding the wages a factor." Although an award of double damages and attorney's fees under § 31-72 requires proof of "bad faith, arbitrariness or unreasonableness" by the employer; (internal quotation marks omitted) *Sansone* v. *Clifford*, 219 Conn. 217, 229, 592 A.2d 931 (1991); we note that the defendant does not claim that the trial court improperly awarded double damages and attorney's fees in the absence of this predicate.

[18] On the basis of certain concessions by the plaintiff, the trial court rendered judgment for Peter Berry as an individual defendant. See footnote 3 of this opinion.

[19] The trial court reserved judgment on the attorney's fee award under § 31-72. We note that this does not affect the finality of the trial court's judgment for purposes of our subject matter jurisdiction over this appeal. See, e.g., *Paranteau* v. *DeVita*, 208 Conn. 515, 523, 544 A.2d 634 (1988).

On appeal, the defendant claims that the trial court improperly: (1) concluded that the bonuses claimed by the plaintiff are wages under § 31-71a (3); (2) construed the employment agreement in calculating the bonuses owed to the plaintiff; (3) rejected its accord and satisfaction and waiver defenses; and (4) denied the defendant's motion to dismiss the counterclaim on grounds of standing and judicial estoppel. Additional facts and procedural history will be set forth as necessary.

I

Because the defendant's standing arguments implicate our subject matter jurisdiction, we begin with its claims that the trial court improperly denied its motion to dismiss the counterclaim. Specifically, the defendant claims that: (1) the plaintiff lacked standing to bring this counterclaim because, when he filed for bankruptcy protection twice in 2005, he surrendered those claims to the trustee of the bankruptcy estate (trustee), and his failure to schedule the claims as assets meant that they remained part of the bankruptcy estate even after those proceedings had terminated; and (2) under the doctrine of judicial estoppel, the plaintiff's failures to disclose the claims during the bankruptcy proceedings bar him from reasserting them in this state court proceeding.

The record reveals the following additional relevant undisputed facts and procedural history. In January, 2005, the plaintiff filed for federal bankruptcy protection under chapter 13 of the United States Bankruptcy Code. The plaintiff did not list the unpaid second bonus as an asset on the bankruptcy schedules because his bankruptcy attorney had not advised him to do so. In July, 2005, after the plaintiff had initiated proceedings with the department to collect the unpaid second and third bonuses, the Bankruptcy Court dismissed his

bankruptcy petition before the plaintiff had received a discharge of his debts because he had failed to submit to the trustee certain state income tax returns.

In October, 2005, while the defendant's original action against the plaintiff to enforce the noncompete provisions of the employment agreement was pending, the plaintiff filed a second chapter 13 bankruptcy petition in order to protect his home from foreclosure. The plaintiff then filed the counterclaim in Superior Court that gives rise to the present appeal, seeking payment of the unpaid bonuses in November, 2005. The plaintiff again did not amend the asset schedule in the second bankruptcy to include these claims. The pending bankruptcy petition then stayed this action. See 11 U.S.C. § 362; Practice Book § 14-1.

On January 23, 2007, after the plaintiff had refinanced his mortgage on his house outside of the bankruptcy proceedings, the Bankruptcy Court dismissed the second petition without discharging the debts, which terminated the stay of this action.[20] Thereafter, the plaintiff filed the revised counterclaim on January 29, 2008, more than one year after the dismissal of his second bankruptcy petition.

On June 11, 2008, the defendant moved to dismiss the revised counterclaim, claiming that the court lacked subject matter jurisdiction. The defendant claimed specifically that the plaintiff's failure to schedule these claims in his bankruptcy petitions meant that they had not revested in him personally, and therefore, he lacked standing to bring suit on it. The defendant also contended that the plaintiff's failure to schedule these claims had judicially estopped him from bringing them against the defendant in the present state court action.

[20] The trustee had moved to dismiss the petition because, although the court confirmed a plan in March, 2006, the plaintiff had failed to make timely payments under that plan.

On July 3, 2008, the plaintiff filed the amended counter-claim. See footnote 14 of this opinion.

Thereafter, Judge Rittenband held a hearing on the defendant's motion to dismiss and rendered judgment in the form of an oral decision denying that motion.[21] The court concluded that 11 U.S.C. § 349 (b) (3),[22] "upon the dismissal of a [bankruptcy] case . . . revest[s] the property of the estate in the entity in which such property was vested immediately before the commencement of the case . . . ." Thus, after the second petition was dismissed, the claims had revested in the plaintiff, who, therefore, had standing to assert them against the defendant. Moreover, the trial court concluded that the plaintiff's failure to disclose the claims in his bankruptcy petitions did not preclude the claims from revesting because neither the Bankruptcy Court nor his creditors had relied detrimentally on such nondisclosure.

A

The defendant first contends that, although the plaintiff had the right to pursue these claims when they first arose in 2004, he had surrendered ownership of these claims, as assets, to the trustee once he filed for bankruptcy protection in 2005. Relying on, inter alia, *Kunica v. St. Jean Financial, Inc.*, 233 B.R. 46 (Bankr. S.D.N.Y. 1999), the defendant contends further that, because the plaintiff had failed to disclose the claims to the Bankruptcy Court, the trustee was precluded from

---

[21] The defendant did not provide this court with a signed transcript of the court's oral decision on its motion to dismiss; see Practice Book § 64-1 (a); but we will review the defendant's claim because the unsigned transcript adequately reveals the basis for the court's decision to deny the defendant's motion to dismiss. See, e.g., *In re Diamond J.*, 121 Conn. App. 392, 398–99, 996 A.2d 296 (2010).

[22] Section 349 (b) of title 11 of the United States Code provides in relevant part: "Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title . . .

"(3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title."

abandoning them to the plaintiff pursuant to 11 U.S.C. § 554,[23] and they remained part of the bankruptcy estate even after the dismissal of the case, rather than revesting in the plaintiff, effectively meaning that he never regained standing to assert the claims in a personal or nonrepresentative capacity. In response, the plaintiff relies on, inter alia, *B.N. Realty Associates* v. *Lichtenstein*, 21 App. Div. 3d 793, 801 N.Y.S.2d 271 (2005), and contends that 11 U.S.C. § 554 does not apply because he never received a *discharge* in bankruptcy, or its " 'functional equivalent' " but, rather, his bankruptcies were *dismissed* pursuant to 11 U.S.C. § 1307 (c)[24] without any administration. Instead, the plaintiff

[23] Section 554 of title 11 of the United States Code provides: "(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

"(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

"(c) Unless the court orders otherwise, any property scheduled under section 521 (1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

"(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate."

[24] Section 1307 (c) of title 11 of the United States Code provides: "Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including—

"(1) unreasonable delay by the debtor that is prejudicial to creditors;

"(2) nonpayment of any fees and charges required under chapter 123 of title 128;

"(3) failure to file a plan timely under section 1321 of this title;

"(4) failure to commence making timely payments under section 1326 of this title;

"(5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;

"(6) material default by the debtor with respect to a term of a confirmed plan;

claims, the effect of a dismissal pursuant to 11 U.S.C. § 1307 (c) is governed by 11 U.S.C. § 349 (b) (3), which is intended to restore the parties to their status at the commencement of the proceedings. Thus, the plaintiff contends that the claims properly revested in him upon the dismissal of the bankruptcy petition, and he, therefore, has standing to maintain this action. We agree with the plaintiff.

"The issue of standing implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. . . . [I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. . . . It is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . . Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, our review is plenary." (Citations omitted; internal quotation marks omitted.) *Wilcox* v. *Webster Ins., Inc.*, 294 Conn. 206, 213–14, 982 A.2d 1053 (2009).

Commencement of a bankruptcy proceeding creates an estate that comprises "all legal or equitable interests of the debtor in property as of the commencement of

"(7) revocation of the order of confirmation under section 1330 of this title, and denial of confirmation of a modified plan under section 1329 of this title;

"(8) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan other than completion of payments under the plan;

"(9) only on request of the United States trustee, failure of the debtor to file, within fifteen days, or such additional time as the court may allow, after the filing of the petition commencing such case, the information required by paragraph (1) of section 521;

"(10) only on request of the United States trustee, failure to timely file the information required by paragraph (2) of section 521; or

"(11) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition."

the case." 11 U.S.C. § 541 (a) (1). The debtor must file a formal statement with the Bankruptcy Court including a schedule of his or her assets and liabilities. See 11 U.S.C. § 521 (a) (1) (B) (i). The assets, which become the property of the bankruptcy estate, include all causes of action belonging to the debtor that accrued prior to the filing of the bankruptcy petition. See, e.g., *In re Jackson*, 593 F.3d 171, 176 (2d Cir. 2010). A cause of action becomes a part of the bankruptcy estate even if the debtor fails to schedule the claim in his petition. See, e.g., *Rosenshein* v. *Kleban*, 918 F. Sup. 98, 103 (S.D.N.Y. 1996). "Property that is scheduled pursuant to 11 U.S.C. § 521 (1), but not administered by the plan, is abandoned to the debtor by operation of law at the close of the bankruptcy case. See 11 U.S.C. § 554 (c). By contrast, property that is not formally scheduled is not abandoned and therefore remains part of the estate. See 11 U.S.C. § 554 (d) . . . ." *Rosenshein* v. *Kleban*, supra, 102–103. "Courts have held that because an unscheduled claim remains the property of the bankruptcy estate, the debtor lacks standing to pursue the claims after emerging from bankruptcy, and the claims must be dismissed." Id., 103.

We agree with the plaintiff that 11 U.S.C. § 554 does not deprive him of standing with respect to his counterclaim, and that, because of the dismissal pursuant to 11 U.S.C. § 1307 (c); see footnote 24 of this opinion; 11 U.S.C. § 349 (b) (3) is dispositive of the defendant's subject matter jurisdiction claim in this appeal. Section 349 (b) (3) of title 11 of the United States Code provides in relevant part: "Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title . . . (3) *revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.*" (Emphasis added.) "The basic purpose of . . . [11 U.S.C. § 349 (b)] is to undo the bankruptcy

case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case." (Internal quotation marks omitted.) *In re Randall*, 358 B.R. 145, 168 (Bankr. E.D. Pa. 2006), quoting H. Rep. No. 95-595, p. 338 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6294; see also *Anquillare, Lipnicki, Ruocco & Co.* v. *VCR Realty Associates*, 72 Conn. App. 821, 824, 808 A.2d 682 (2002) ("after the dismissal of the bankruptcy petition, the bankruptcy estate revested in the [entity that had filed a petition for protection against creditors]"). "Following this legislative background, bankruptcy courts have observed . . . that the dismissal of a bankruptcy case should [reestablish] the rights of the parties as they existed when the petition was filed . . . . Indeed, unless the court indicates otherwise, the general effect of an order of dismissal is to restore the status quo ante; it is as if the bankruptcy petition had never been filed." (Internal quotation marks omitted.) *In re Randall*, supra, 168.

With no Connecticut case law directly on point,[25] we agree with the plaintiff's reliance on, inter alia, *B.N. Realty Associates* v. *Lichtenstein*, supra, 21 App. Div. 3d 793, in support of the proposition that, under 11 U.S.C. § 349 (b) (3), the failure to disclose a cause of action in bankruptcy proceedings does not preclude the assertion of that claim in proceedings instituted after the dismissal of the bankruptcy proceedings. In *B.N. Realty Associates* v. *Lichtenstein*, supra, 798, the First Department of the Appellate Division of the New

[25] We disagree with the defendant's reliance on *Dana Investment Corp.* v. *Robinson & Cole*, Superior Court, judicial district of New Britain, Docket No. X03-CV-00-0505126-S (March 8, 2001), in support of its claim that the plaintiff lacks standing because of his failure to schedule his claims herein as assets in the bankruptcy petitions. *Dana Investment Corp.* is distinguishable because in that case, the bankruptcy petition was not dismissed, but, rather, converted from a chapter 11 to a chapter 7 case, and the Bankruptcy Court then rendered a final decree and closed the case. Id.

York Supreme Court concluded that, when the Bankruptcy Court dismisses the debtor's petition, 11 U.S.C. § 349 (b) (3) operates to "restor[e] his standing to assert his alleged counterclaims, defenses and offsets in this action, notwithstanding his failure (which we obviously do not condone) to disclose such matters in the bankruptcy case . . . ."[26] (Citation omitted.) Significantly, the New York court distinguished *Kunica* v. *St. Jean Financial, Inc.*, supra, 233 B.R. 46, a case that the

[26] The defendant contends that *B.N. Realty Associates* v. *Lichtenstein*, supra, 21 App. Div. 3d 793, is distinguishable on the ground that the court "bolstered" its conclusion by noting that the bankruptcy petition therein at least disclosed the pendency of the underlying action itself, if not the counterclaims at issue. Id., 798 n.2. As the defendant points out, there apparently is an interdepartmental split in New York's Appellate Divisions with respect to this issue, yet to be resolved by the state's highest court, as the Second Department has relied on that distinction to distinguish *B.N. Realty Associates*. Specifically, in *Nationwide Associates, Inc.* v. *Epstein*, 24 App. Div. 3d 738, 739, 809 N.Y.S.2d 118 (2005), appeal withdrawn, 7 N.Y.3d 899, 860 N.E.2d 70, 826 N.Y.S.2d 608 (2006), the Second Department of the Appellate Division relied on *Kunica* v. *St. Jean Financial, Inc.*, supra, 233 B.R. 46, and *Best* v. *MetLife Auto & Home Ins. Co.*, 7 Misc. 3d 242, 793 N.Y.S.2d 682 (2004), also relied upon by the defendant herein, and concluded that: "The fact that [the plaintiff's] bankruptcy proceeding was dismissed rather than discharged does not alter the effect of [the plaintiff's] failure to disclose the [legal malpractice] claim it now seeks to assert here . . . ." (Citations omitted.) *Nationwide Associates, Inc.* v. *Epstein*, supra, 739. The court then distinguished *B.N. Realty Associates*, by noting that, in that case, "the petitioner in bankruptcy had disclosed the pendency of the action in which his counterclaims were asserted . . . [and] there is no evidence in this record from which we can conclude that the other parties to [the plaintiff's] bankruptcy proceeding would have been able, with some investigation, to discover the claims that [the plaintiff] failed to disclose." Id.

In our view, the First Department's decision in *B.N. Realty Associates* is more persuasive. First, the Second Department's decision in *Nationwide Associates, Inc.*, is a summary decision that is not informative with respect to the nature or progress of the bankruptcy proceedings therein, and fails to account for either 11 U.S.C. § 349 (b) (3) or the court's observation in *Kunica* that, in that case, the dismissal was the "functional equivalent" of a discharge. Accordingly, without a decision to the contrary from the New York Court of Appeals, we will follow the reasoning of the First Department's decision in *B.N. Realty Associates*. But see also *Kilpatrick* v. *Kilpatrick*, 205 S.W.3d 690, 702 (Tex. App. 2006) ("we accept the reasoning of *Kunica* and hold that only disclosed assets will be revested to the debtor upon the dismissal of a bankruptcy proceeding"), review denied, 2007 Tex. LEXIS 181 (February 23, 2007).

defendant in the present case relies upon in support of its contention that the undisclosed claims did not revest in the plaintiff. The New York court relied on the federal District Court's observation that the debtor in *Kunica* had "arguably obtained the functional equivalent of a discharge" because it had "obtained its dismissal after its [bankruptcy] case was fully administered and all of its assets scheduled . . . ." (Citation omitted; internal quotation marks omitted.) *B.N. Realty Associates* v. *Lichtenstein,* supra, 798, quoting *Kunica* v. *St. Jean Financial, Inc.,* supra, 55. In contrast, the debtor in *B.N. Realty Associates* had not " 'obtained the functional equivalent of a discharge,' " as his assets had not been administered or his debt restructured prior to the dismissal. *B.N. Realty Associates* v. *Lichtenstein,* supra, 798. Thus, we conclude that the plaintiff in the present case, like the debtor in *B.N. Realty Associates,* has standing to assert this counterclaim because the Bankruptcy Court had dismissed his petitions prior to their administration. See also *Dance* v. *Louisiana State University Medical Center,* 749 So. 2d 870, 873–74 (La. App. 1999) (rejecting claim that plaintiffs' failure to schedule cause of action as asset in chapter 13 bankruptcy proceeding caused it to remain part of bankruptcy estate pursuant to 11 U.S.C. § 554 after voluntary dismissal of proceeding, and concluding that they could pursue it under 11 U.S.C. § 349 [b] [3]), writ denied, 759 So. 2d 76 (La. 2000). The trial court, therefore, properly denied the defendant's motion to dismiss the plaintiff's revised counterclaim for lack of standing.

## B

The defendant also claims that the plaintiff's counterclaim is barred by the doctrine of judicial estoppel, which precludes parties from asserting claims that are inconsistent with those made in prior court proceedings. It claims that the trial court should have barred the plaintiff from pursuing his monetary claims because

his failure to disclose such claims during the bankruptcy proceedings amounted to an affirmative misrepresentation to that court. In response, the plaintiff contends that the doctrine of judicial estoppel does not bar him from pursuing his claims since his petitions were dismissed and, therefore, neither the Bankruptcy Court nor his creditors relied on his nondisclosure to their detriment. The plaintiff also emphasizes that his failure to disclose the monetary claims against the defendant to the Bankruptcy Court was an unintentional error. We conclude that the trial court did not abuse its discretion by declining to invoke the doctrine of judicial estoppel to bar the plaintiff's counterclaim.

Because this case presents the first opportunity for this court or the Appellate Court to consider the doctrine of judicial estoppel as a matter of Connecticut law,[27] we turn for guidance to the significant body of federal case law addressing this doctrine, and note that "[j]udicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding. . . . [J]udicial estoppel serves interests different from those served by equitable estoppel, which is designed to ensure fairness in the relationship between parties. . . . The courts invoke judicial estoppel as a means to preserve the sanctity of the oath or to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." (Citations omitted; internal quotation marks omitted.) *Simon* v. *Safelite Glass Corp.*, 128 F.3d 68,

---

[27] See *David M. Somers & Associates, P.C.* v. *Kendall*, 123 Conn. App. 31, 36–37, 1 A.3d 217 (2010) ("It is unclear whether the doctrine of judicial estoppel has officially been adopted in Connecticut. . . . [W]e need not decide that question today." [Citation omitted.]); *Dougan* v. *Dougan*, 114 Conn. App. 379, 390 n.14, 970 A.2d 131 (declining to reach issue because of parties' failure to raise it), cert. granted in part on other grounds, 292 Conn. 920, 974 A.2d 721 (2009); *SKW Real Estate Ltd. Partnership* v. *Mitsubishi Motor Sales of America, Inc.*, 56 Conn. App. 1, 8–9 and 8 n.6, 741 A.2d 4 (1999) (noting lack of factual basis for application of doctrine), cert. denied, 252 Conn. 931, 746 A.2d 793 (2000).

71 (2d Cir. 1997); see also, e.g., *New Hampshire* v. *Maine*, 532 U.S. 742, 749–50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (judicial estoppel "protect[s] the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment" [citation omitted; internal quotation marks omitted]).

"Typically, judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel. . . . We further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." (Citation omitted; internal quotation marks omitted.) *DeRosa* v. *National Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010). Thus, courts generally will not apply the doctrine if the first statement or omission "was the result of a good faith mistake . . . or an unintentional error." (Citations omitted.) *Simon* v. *Safelite Glass Corp.*, supra, 128 F.3d 73.

A party who fails to schedule a cause of action as an asset in a bankruptcy proceeding may create an inconsistency subject to the doctrine of judicial estoppel that would preclude it from bringing that cause of action subsequent to the bankruptcy. See, e.g., *Galin* v. *Internal Revenue Service*, 563 F. Sup. 2d 332, 338–39 (D. Conn. 2008). This is because "the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets. The courts will not permit a debtor to obtain relief from the [B]ankruptcy [C]ourt by representing that no claims exist and then subsequently to assert those claims for his own benefit in a separate proceeding. The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the

disclosure statements, and the [B]ankruptcy [C]ourt, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete." *Rosenshein* v. *Kleban*, supra, 918 F. Sup. 104.

"Because the rule is intended to prevent improper use of judicial machinery . . . judicial estoppel is an equitable doctrine invoked by a court at its discretion . . . ." (Citation omitted; internal quotation marks omitted.) *New Hampshire* v. *Maine*, supra, 532 U.S. 750; see also *Galin* v. *Internal Revenue Service*, supra, 563 F. Sup. 2d 339 (same). Accordingly, our review of the trial court's decision not to invoke the doctrine is for abuse of discretion. See, e.g., *Robinson* v. *Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010); *Williams* v. *Boeing Co.*, 517 F.3d 1120, 1134 (9th Cir. 2008).

The plaintiff fully acknowledges his failure to disclose his monetary claims against the defendant to the Bankruptcy Court in both bankruptcy cases. We agree with the plaintiff that the trial court did not abuse its discretion in declining to utilize the doctrine of judicial estoppel to preclude the counterclaim, as courts generally will not apply the doctrine if the first statement or omission "was the result of a good faith mistake . . . or an unintentional error."[28] (Citations omitted.) *Simon*

---

[28] We recognize that there is a body of federal case law that is "hostile to an inadvertence or good faith mistake exception to judicial estoppel. In the context of nondisclosure of pending claims to a bankruptcy court, several circuit courts have held that failure to fully disclose such claims will only be deemed inadvertent or due to mistake when either the debtor has no knowledge of the claims or no motive to conceal the claims." *Galin* v. *Internal Revenue Service*, supra, 563 F. Sup. 2d 340, citing, inter alia, *Eastman* v. *Union Pacific Railroad Co.*, 493 F.3d 1151, 1158 (10th Cir. 2007); *Barger* v. *Cartersville*, 348 F.3d 1289, 1296 (11th Cir. 2003); see also *Galin* v. *Internal Revenue Service*, supra, 341 ("[c]ourts have inferred the absence of mistake at the summary judgment stage when a debtor has knowledge of the claim and motive to conceal it"); *Galin* v. *Internal Revenue Service*, supra, 341 ("legal advice and ignorance of the law are not defenses to judicial estoppel"). But see *Ryan Operations G.P.* v. *Santiam-Midwest Lumber Co.*, 81 F.3d 355, 364 (4th Cir. 1996) (concluding that "policy considerations militate against adopting a rule that the requisite intent for judicial estoppel

v. *Safelite Glass Corp.*, supra, 128 F.3d 73; *In re Andrews*, 385 B.R. 496, 502 (Bankr. D. Conn. 2008). The defendant failed to develop the record on this issue further at the hearing before the trial court on its motion to dismiss, and has not pointed to any evidence contradicting the plaintiff's assertion that he did not realize that he was supposed to list this counterclaim as an asset in the bankruptcy proceeding, and was not advised to that effect by his bankruptcy attorney. Moreover, given the dismissals of the plaintiff's bankruptcy petitions, there is neither a risk of inconsistent results between the state and federal courts, nor any indication that either the Bankruptcy Court or the plaintiff's creditors, who did not include among them the defendant, were prejudiced by that nondisclosure. Accordingly, we conclude that the trial court did not abuse its discretion by declining to invoke the doctrine of judicial estoppel.

II

We next turn to the principal issue in this appeal, namely, the defendant's claim that the bonuses claimed by the plaintiff under § 2.2 (b) of the employment agreement are not wages as defined by § 31-71a (3). Relying primarily on *Weems* v. *Citigroup, Inc.*, 289 Conn. 769, 961 A.2d 349 (2008), the defendant contends that the bonuses are not wages because they were based entirely on the profitability of the Digital Group, and were not connected directly with the plaintiff's personal

can be inferred from the mere fact of nondisclosure in a bankruptcy proceeding" and noting that "[w]hile we by no means denigrate the importance of full disclosure or condone nondisclosure in bankruptcy proceedings, we are unwilling to treat careless or inadvertent nondisclosures as equivalent to deliberate manipulation when administering the 'strong medicine' of judicial estoppel"). Given the lack of evidence in the record with respect to any manipulative intent by the plaintiff, and the defendant's failure in its principal or reply briefs to cite any of the cases limiting the availability of the inadvertence or good faith exceptions to judicial estoppel in the bankruptcy context, we decline to rely on them as a basis for upsetting the trial court's exercise of its discretion.

labor or services. The defendant characterizes the bonuses as a profit sharing mechanism, and emphasizes that the Digital Group's "profit would result from the efforts of other employees, from the payments made [by the defendant's clients] for receiving [the] Digital [Group] services, and by minimizing or eliminating expenses within [the] Digital [Group]. Whether [the plaintiff] ever showed up for work did not dictate the bonus amount or his right to receive a payment . . . [which] relied on a formula and a calculation which had no connection with [the plaintiff's] performance." In response, the plaintiff emphasizes the remedial purpose of the wage statutes; *Mytych* v. *May Dept. Stores Co.*, 260 Conn. 152, 160, 793 A.2d 1068 (2002); and contends that the wage statutes must be liberally construed in favor of employees. The plaintiff also relies on New York case law, which we followed in *Weems*, and contends that a contractually mandated, nondiscretionary bonus calculated under a predetermined formula is subject to the wage statutes, and emphasizes that *Weems* should be limited to the context of discretionary bonuses. Guided in part by our recent decision in *Ziotas* v. *Reardon Law Firm, P.C.*, 296 Conn. 579, 997 A.2d 453 (2010), we conclude that the trial court properly determined that the bonuses in the present case were wages because they were nondiscretionary and calculated in accordance with a precise formula set forth in § 2.2 (b) of the employment agreement.

"Whether a bonus constitutes a wage under § 31-71a (3) raises a question of statutory construction, which is a [question] of law, over which we exercise plenary review." (Internal quotation marks omitted.) *Weems* v. *Citigroup, Inc.*, supra, 289 Conn. 778. We note, however, that "[i]n determining whether the plaintiff's . . . bonus[es are] included in [the] definition of wages, we do not write on a blank slate." *Ziotas* v. *Reardon Law Firm, P.C.*, supra, 296 Conn. 587.

We begin then, with *Weems*, wherein we determined initially that the text of § 31-71a (3), which defines wages as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation," was ambiguous as to whether a bonus, even one "discretionary or not specifically tied to identifiable extra work performed by an employee, could be considered 'compensation for labor or services rendered . . . .'" (Citation omitted.) *Weems* v. *Citigroup, Inc.*, supra, 289 Conn. 779. Considering extratextual sources to determine the ambiguous statute's meaning; see General Statutes § 1-2z; we noted the absence of guidance in the legislative history and turned instead to New York case law that construed that state's similar wage statute. See *Weems* v. *Citigroup, Inc.*, supra, 780–82, discussing, inter alia, *Truelove* v. *Northeast Capital & Advisory, Inc.*, 95 N.Y.2d 220, 738 N.E.2d 770, 715 N.Y.S.2d 366 (2000). In accordance with that body of case law, we concluded that "bonuses that are awarded solely on a discretionary basis, and are not linked solely to the ascertainable efforts of the particular employee, are not wages under § 31-71a (3)."[29] *Weems* v. *Citigroup, Inc.*, supra, 782. Applying that standard to the facts of

---

[29] In discussing *Truelove* v. *Northeast Capital & Advisory, Inc.*, supra, 95 N.Y.2d 220, we noted that the New York Court of Appeals had concluded that the bonus therein was not a wage because, "the 'terms of the [firm's] bonus compensation plan did not predicate bonus payments upon [the employee's] own personal productivity nor give [the employee] a contractual right to bonus payments based upon his productivity. To the contrary, the declaration of a bonus pool was dependent solely upon his employer's overall financial success. In addition, [the employee's] share in the bonus pool was entirely discretionary and subject to the non-reviewable determination of his employer.' Id., 224. Thus, the [New York Court of Appeals] concluded that 'the wording of the statute, in expressly linking earnings to an employee's labor or services personally rendered, contemplates a more direct relationship between an employee's own performance and the compensation to which that employee is entitled. Discretionary additional remuneration, as a share in a reward to all employees for the success of the employer's entrepreneurship, falls outside the protection of the statute.'" *Weems* v. *Citigroup, Inc.*, supra, 289 Conn. 780–81.

*Weems*, we concluded that the terms of the bonuses at issue therein were "not wages subject to Connecticut's wage statutes . . . [because] [p]ayments under both the bonus and branch manager programs are purely discretionary." Id. We further rejected the claim that "branch managers had to achieve 'specific goals' to receive the bonuses, thus rendering them compensation for services rendered"; id.; because the record indicated that "the bonus awards are tied to subjective factors such as diversity within a branch, and the profitability of the particular branches, which are factors not entirely predictable or within the control of the specific employee." Id.

Subsequently, in *Ziotas* v. *Reardon Law Firm, P.C.*, supra, 296 Conn. 583–84, the plaintiff claimed that his former employer, a law firm at which he had been an associate attorney, had violated the wage statutes by failing to pay him his annual bonus, customarily paid in December, after he left the employ of the law firm in October, 1998. That bonus was entirely discretionary and "not calculated on the basis of any particular percentage of the [law firm's] income."[30] Id., 583. We noted that *Weems* and the cases cited therein did not "address the situation in which the payment of a bonus was contractually required and only the amount of the bonus was discretionary"; id., 588–89; but followed *Weems* to

---

[30] The applicable employment agreement provided that the plaintiff was an employee at will, and that: " 'Annual compensation shall be subject to review by the Board of Directors of [the law firm] on the anniversary of employment of [t]he Associate. Compensation shall be based, in part, on the following criteria:

" 'a. Seniority in [the law firm],

" 'b. Business generation,

" 'c. Business productivity,

" 'd. Quality of work/professional ability,

" 'e. Work profitability,

" 'f. Participation in professional activities and pro bono work,

" 'g. Noteworthy outside activities,

" 'h. Loyalty and commitment to [the law firm].' " *Ziotas* v. *Reardon Law Firm, P.C.*, supra, 296 Conn. 583.

conclude that "such a bonus does not constitute wages under § 31-71a (3) . . . [because] 'the wording of the statute, in expressly linking earnings to an employee's labor or services personally rendered, contemplates a more direct relationship between an employee's own performance and the compensation to which that employee is entitled. Discretionary additional remuneration, as a share in a reward to all employees for the success of the employer's entrepreneurship, falls outside the protection of the statute.' . . . Although an employee may have a justified expectation of additional compensation when the employer is contractually obligated to give a bonus to the employee and any contractual conditions, such as the employer's annual profitability, are met, the relationship between performance and compensation is still attenuated if the amount of the bonus is discretionary and dependent on factors other than the employee's performance."[31] (Citation omitted.) Id., 589.

Guided by *Ziotas* and *Weems*, we conclude that the trial court properly determined that the bonuses in the present case were wages as defined by § 31-71e (3) because, under the employment agreement, they were entirely nondiscretionary, both as to whether they would be awarded, and the amount thereof. Under the employment agreement, the defendant was contractually bound to pay the bonus to the plaintiff. Additionally, the amount of the bonus, which derived from the net profitability of the Digital Group after expenses, was nondiscretionary because it was subject to calculation by applying a contractually mandated, precise formula set forth in § 2.2 (b) of the employment agreement. That formula was based on the budgets of the Digital Group,

---

[31] We emphasized, however, that an employee is not precluded from collecting a bonus that is contractually mandated, but indefinite in amount, under a breach of contract theory, despite the lack of relief available for such a bonus under the wage statutes. See *Ziotas* v. *Reardon Law Firm, P.C.*, supra, 296 Conn. 591–92.

one of which, for fiscal year 2003–2004, was attached to the employment agreement as a schedule, and the other, for fiscal year 2004–2005, that was plainly cross-referenced therein. See footnote 6 of this opinion; see also *Farricker* v. *Penson Development, Inc.*, United States District Court, Docket No. 07 Civ. 11191 (DAB), 2009 U.S. Dist. LEXIS 27484, \*21–22 (S.D.N.Y. March 31, 2009) (bonus payments for identifying and consummating real estate deals were wages when contract "clearly laid out the circumstances under which [they] were to be paid; both how much and when, and did not involve management discretion so as to render them incentive compensation," and payments were reduced by base salary); *Fiorenti* v. *Central Emergency Physicians, P.L.L.C.*, 187 Misc. 2d 805, 808–809, 723 N.Y.S.2d 851 (2001) (bonus was wage when contract set forth formula for calculating bonus that "takes into account the employee's personal productivity" by measuring contribution to billing as offset by expenses because "[t]he standard to be applied for entitlement to a bonus is objective and not subject to [the employer's] discretion or whim"), rev'd in part on other grounds, 305 App. Div. 2d 453, 762 N.Y.S.2d 402 (2003).

The defendant relies, however, on our statement in *Weems* v. *Citigroup, Inc.*, supra, 289 Conn. 782, that bonuses are not wages under § 31-71a (3) if they are "not linked solely to the ascertainable efforts of the particular employee . . . ." The defendant contends that the bonuses were based on the productivity of the Digital Group as a whole, and that there is no "evidence directly linking those results solely" to the efforts of the plaintiff. We disagree. First, we reiterate that, unlike the present case, in *Weems*, both the awarding of a bonus, and the amount thereof, were entirely discretionary. *Weems* v. *Citigroup, Inc.*, supra, 782. Furthermore, this narrow reading of *Weems* does not recognize the nature of the plaintiff's employment as a senior level,

executive manager of one of the defendant's divisions, with the bonus tied *directly* to the success of that specific division, rather than the performance of the defendant as a whole. Although the profitability of any business entity depends in no small part on the performance of that organization's employees, schedule 3.2 of the employment agreement, as well as the parties' testimony, demonstrates that the plaintiff was employed primarily to manage the Digital Group's employees and operations. As reflected in the trial court's finding that the bonus "is tied into achievement of better work performance on the part of [the plaintiff] to obtain a higher profit which results in a higher bonus,"[32] the requisite "ascertainable efforts" are reflected in the plaintiff's execution of his management responsibilities vis-á-vis the employees and other resources of the Digital Group in order to accomplish the profitability goals of that particular division.[33] Indeed, Peter Berry testified that the plaintiff could have accomplished that task in multiple ways, including

[32] We note that the plaintiff was the defendant's only employee with a contract that gave him an established right to a particular bonus. Peter Berry testified that the defendant's other employees received bonuses, but that those bonuses were not preestablished by contract. Moreover, Suzanne Berry testified that the structure of the plaintiff's bonus ultimately became infeasible, as it gave the plaintiff an incentive to act in his own self-interest to increase his own bonus by either overcharging clients or being less generous with the compensation of the staff assigned to the Digital Group.

[33] If we were to agree with the defendant's reading of *Weems* v. *Citigroup, Inc.*, supra, 289 Conn. 780–82, then no management level employee overseeing the work of other employees would ever be entitled to prevail under the wage statutes when bringing a claim to recover an unpaid bonus. There is no indication in the language of the wage statutes or their legislative history that the legislature intended to exclude all management level employees. Compare General Statutes § 31-71a (2) (defining " '[e]mployee' " for purposes of wage act as "any person suffered or permitted to work by an employer"), with General Statutes § 31-58 (f) (defining " '[e]mployee' " for purposes of minimum fair and overtime wage statute as, inter alia, "any individual employed or permitted to work by an employer but shall not include . . . an individual employed in a bona fide executive, administrative or professional capacity as defined in the regulations of the Labor Commissioner"). We therefore decline the defendant's apparent invitation to do so.

reducing costs, raising prices and generating more business. Put differently, to conclude that the bonus is not a wage because not every dollar earned by the Digital Group was directly attributable to the plaintiff's labors would be to ignore the realities of his executive-level managerial position, which was to be directly and solely responsible for the profitability of that division.[34]

The plaintiff's contract thus established the necessary link between the plaintiff's efforts and the mandated bonus. See *Dallenbach* v. *Mapco Gas Products, Inc.*, 459 N.W.2d 483, 488 (Iowa 1990) (district manager's annual bonus was wage when contractually based on percentage of district's profits with adjustment by formula, and "clearly was part of the compensation owed him for his labor or services"); *Kvidera* v. *Rotation Engineering & Mfg. Co.*, 705 N.W.2d 416, 423 (Minn. App. 2005) (company president's bonus was statutory wage because it was "integral and negotiated part of his compensation package" and his "services contributed to [the company's] profitability, and [the company] received the benefit of [the president's] work product"); *Suess* v. *Lee Sapp Leasing, Inc.*, 229 Neb. 755, 757, 762–63, 428 N.W.2d 899 (1988) (leasing manager's bonus was statutory wage when his contract granted him, inter alia, base salary plus 10 percent of employer's profits according to bonus formula); *Ives* v. *Manchester Subaru, Inc.*, 126 N.H. 796, 800, 498 A.2d 297 (1985) (automobile dealership manager's entitlement to percentage of dealer profits was wage because "[i]t is obvi-

---

[34] Thus, the plaintiff's role as the manager of a specific division, and the relationship of the bonus to the financial success of that division, rather than to the success of the defendant as a whole, renders inapposite case law considering bonuses not to be wages because they were tied to the employer's overall success. See, e.g., *Ziotas* v. *Reardon Law Firm, P.C.*, supra, 296 Conn. 589. Accordingly, we find misplaced the defendant's emphasis on the plaintiff's testimony that his bonus amount bore no relation to the number of hours that he worked per week, specifically, that his bonus would be the same if he worked ten hours, or eighty, in a given week.

ous that the parties' agreement for a share of profits was intended to provide compensation for the [manager's] labor and services, and it clearly may fall within the [wage] statute's reference to compensation calculated on some 'other basis' "); but cf. *Highhouse* v. *Midwest Orthopedic Institute, P.C.*, 807 N.E.2d 737, 740 (Ind. 2004) (A surgeon's bonus, provided for by contract, was not a statutory wage because it "turned on both [the surgeon's] productivity and also on 'expenses of [the multiphysician practice's] operations,' presumably allocated based on revenue. [The surgeon] had no control over most of these expense items and they obviously affected [the practice's] bottom line."). Thus, we conclude that the bonus in the present case, which was nondiscretionary and narrowly tailored to the success of the corporate division over which the plaintiff had direct supervisory authority, was a wage as defined by § 31-73a (3).

### III

The defendant next claims that the trial court improperly construed the employment agreement in calculating the bonus amounts for the second and third bonuses. Pointing to plaintiff's exhibit four, which is the Digital Group's *audited* financial statement for the fiscal year of July 1, 2004, to June 30, 2004, the defendant contends that, with respect to the second bonus period, which covers the period from January 1, 2004, to June 30, 2004, the trial court improperly relied on plaintiff's exhibit nine, the *budget schedule* 2.2 attached to the employment agreement, and awarded the plaintiff $50,329, because the plaintiff had claimed entitlement only to a bonus of $31,063. In response, the plaintiff contends that the trial court properly awarded him $50,329 for the second bonus and $67,397 for the third bonus pursuant to the clear and unambiguous terms of the employment agreement, under which the defendant was to pay him 100 percent of the Digital Group's net

profit after the payment of expenses budgeted on a semiannual basis, as set forth in a schedule calculated by the defendant itself. The plaintiff contends that the defendant's argument that the contract terms contemplate calculations based on the final audited expenses is incorrect and simply an expression of buyer's remorse, and is inconsistent with the contract language drafted by the defendant itself, a sophisticated commercial party with superior bargaining power.[35] We agree with the plaintiff and conclude that the trial court properly calculated his bonuses.

We note briefly the following additional relevant facts and procedural history. The applicable contractual provision is § 2.2 (b) of the employment agreement, which provides: "[The plaintiff] shall be paid bonuses on February 15, 2004; August 15, 2004; February 15, 2005 and; August 6, 2005 based upon the overall profitability of the Digital Group from July 1, 2003 through June 20, 2005. Said bonus amounts shall be calculated based upon the 2003–04 Digital Group *budget* as set forth in Schedule 2.2 and the 2004–05 *budget* which will be established in the [s]pring of 2004. [The plaintiff's] bonus shall be equal to the annual income received by the Digital Group less $75,000 for fiscal year 2003–2004 and $80,000 for fiscal year 2004–2005, and less the commissions paid pursuant to [p]aragraph (a) above. [The plaintiff's] bonus will be determined after the Digital Group's expenses are paid for the preceding six month period and after [the defendant] receives its six months

[35] The plaintiff also notes that the defendant's course of conduct, in agreeing with the plaintiff's request for a first bonus of $28,833 in February, 2004, demonstrates the propriety of his calculation method under the contract. If we find § 2.2 (b) of the employment agreement ambiguous, we agree that the parties' course of dealing may be used to aid in its interpretation. See *Small Business Transportation, Inc.* v. *ABC Stores, LLC*, 96 Conn. App. 14, 19, 899 A.2d 73 (2006); see also *Highhouse* v. *Midwest Orthopedic Institute, P.C.*, supra, 807 N.E.2d 739 (relying on undisputed evidence concerning employer's course of conduct in calculating and paying bonuses in construing posttermination bonus provision in employment contract).

prorated income. [The plaintiff] shall then receive the remaining profit." (Emphasis added.)

The trial court concluded that the plaintiff was entitled to a second bonus of $50,329, which was due on August 15, 2004. In calculating that bonus, the trial court relied on the plain language of § 2.2 (b) of the employment agreement, and the parties' application of it to determine that the plaintiff was owed $28,833 for the first bonus period. The trial court then credited the plaintiff's testimony and utilized the Digital Group financial statement prepared by Suzanne Berry for purposes of the bonus negotiations, concluding that the plaintiff was entitled to $50,329, which is the projected annual profit, less the $28,833 already paid for the first half of the fiscal year and the $8000 that the plaintiff already had been paid toward the second bonus. Moreover, the trial court rejected the defendant's claim that it was improper to calculate the bonus using the budget, rather than the final audited figures. The trial court concluded that the defendant was "bound by" its choice of the word "budget" in drafting the employment agreement, ostensibly because the final audited statement "would not be ready in time for the scheduled bonus payments." Applying that same formula to plaintiff's exhibit four, which served as the budget for the third bonus period from July 1, 2004, through December 31, 2004,[36] due on February 15, 2005, the trial court concluded that the plaintiff was entitled to a bonus of $67,397.[37]

---

[36] The plaintiff testified that he had not consulted with the Berrys in preparing this document because, by that time, his relations with them had deteriorated and they did not want to discuss his bonuses any further.

[37] The trial court noted that, in bonus negotiations, the plaintiff originally had countered the defendant's offer of $16,346 with a proposal of $20,000, despite the fact that the plaintiff knew that he was entitled to more. The trial court did not consider the plaintiff's counteroffer dispositive, noting that the budget document indicated that he was entitled to $67,397, and the lower counteroffer was motivated by his need for immediate cash flow in light of personal financial problems that he was experiencing at that time.

"The intent of the parties as expressed in a contract is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . [T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous. . . . If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact, and the trial court's interpretation is subject to reversal on appeal only if it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Honulik* v. *Greenwich*, 293 Conn. 698, 710–11, 980 A.2d 880 (2009).

We conclude at the outset that the trial court properly determined that, under the plain language of § 2.2 (b) of the employment agreement, the plaintiff's bonus was to be calculated on the basis of the Digital Group's

scheduled budgets, one of which was appended to the agreement as schedule 2.2, rather than on the basis of the final audited figures. The ordinary meaning of the term "budget" as a noun contemplates a forward-looking financial plan, based on estimates. See Merriam-Webster Collegiate Dictionary (10th Ed. 1993) (defining "budget" as, inter alia, "a statement of the financial position of an administration for a definite period of time based on estimates of expenditures during the period and proposals for financing them" or "a plan for the coordination of resources and expenditures" or "the amount of money that is available for, required for, or assigned to a particular purpose"); cf. id. (defining "audit" as a "formal examination of an organization's . . . accounts or financial situation" or "the final report of an audit"). We agree with the plaintiff that the defendant, as drafter of the employment agreement, could have exercised its superior bargaining position to draft a more favorable provision. See *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 741, 941 A.2d 309 (2008) (noting "the superior bargaining power of an employer that enters into an employment contract with an employee" given "the economic compulsion facing those in search of employment" [internal quotation marks omitted]). We further agree that the trial court's assessment of the defendant's interpretation of the employment contract as nothing more than a case of buyer's remorse following the Berrys' realization that the agreement "was less favorable to them than they thought," was reasonable.

We next turn to the trial court's application of the contractual provision to calculate the plaintiff's bonuses, and note that "[t]he determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given

specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous. . . . A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Jay* v. *A & A Ventures, LLC*, 118 Conn. App. 506, 518, 984 A.2d 784 (2009), quoting *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 68–69, 717 A.2d 724 (1998).

We conclude that the trial court's calculation of the damages was not clearly erroneous. Utilizing column I of plaintiff's exhibit nine, which Suzanne Berry had utilized during the defendant's discussions with the plaintiff for the purpose of calculating the second bonus, the trial court noted that the profit after expenses for the fiscal year was $87,162. Since the plaintiff already had received $28,833 for the first half of that fiscal year, the trial court properly concluded that he was entitled to an annual bonus for the remainder of that fiscal year of $50,329, which represented the difference between the Digital Group's profit of $87,162 and the bonus already paid, reduced further by the $8000 that the plaintiff already had received. See footnote 8 of this opinion. The trial court also reasonably could have credited the plaintiff's testimony that, given the plain language of § 2.2 of the employment agreement, as well as the fact that $30,000, or 30 percent of his salary, already had been allocated to the expenses of the Digital Group, the defendant should not have included additional salary adjustments ultimately to reduce the bonus owed. Applying a similar calculation to plaintiff's exhibit four, the Digital Group's audited financial statement for the fiscal year July 1, 2004, to

June 30, 2005, the trial court properly found that the plaintiff was entitled to a bonus of $67,397. We conclude, therefore, that the trial court's bonus calculations were not clearly erroneous.[38]

## IV

Finally, we address the defendant's claims that the trial court improperly: (1) rejected its accord and satisfaction defense with respect to the second bonus; and (2) rejected its defense that the parties had entered into a substitute contract under which the plaintiff had waived his claim with respect to the third bonus.

## A

The defendant first claims that the trial court improperly rejected the defendant's accord and satisfaction special defense with respect to the second bonus, claiming that: (1) it had proposed to the plaintiff a bonus payment of $8000;[39] (2) the plaintiff accepted and processed this payment; and (3) this transaction discharged the defendant from any outstanding bonus payment obligation originally due on August 15, 2004. In response, the plaintiff contends that the trial court's rejection of the accord and satisfaction defense was not clearly erroneous because: (1) there was no good faith dispute about the amount owed; (2) he did not

[38] The defendant contends that the trial court's bonus calculations improperly are not based on an accounting of the Digital Group's actual profitability, and also do not account for Suzanne Berry's testimony that some of the figures utilized were derived from the plaintiff's overstatement of certain Digital Group revenues on the basis of, inter alia, overbilling clients. We note that the trial court expressly stated that the bonus payment deadlines set forth in § 2.2 (b) of the employment agreement essentially compelled the defendant to use the budgeted figures, rather than final audited numbers. With respect to the correctness of the figures on the reports, the defendant in essence asks us to retry the facts, which we decline to do. See, e.g., *DuBaldo Electric, LLC* v. *Montagno Construction, Inc.*, 119 Conn. App. 423, 441, 988 A.2d 351 (2010).

[39] For additional discussion regarding the amount proposed, see footnote 8 of this opinion and the accompanying text.

accept the defendant's offer of accord; and (3) he did not accept the bonus payment in full satisfaction of his claim for a greater bonus payment. We agree with the plaintiff that the trial court properly determined that he had not accepted the defendant's offer of accord.

"When there is a good faith dispute about the existence of a debt or about the amount that is owed, the common law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim. . . . An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. . . . Upon acceptance of the offer of accord, the creditor's receipt of the promised payment discharges the underlying debt and bars any further claim relating thereto, if the contract is supported by consideration. . . . Although the case law presents the more usual use of accord and satisfaction as a defense by the debtor against the creditor, it is evident that accord and satisfaction equally applies to both parties. Accord and satisfaction is a method of discharging a claim whereby the parties agree to give and accept something other than that which is due in settlement of the claim and to perform the agreement. . . . Indeed, a validly executed accord and satisfaction precludes a party from pursuing any action involving the original, underlying claim. . . . The defendant bears the burden of proving accord and satisfaction when it is pleaded as a special defense." (Citations omitted; internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 277, 828 A.2d 64 (2003). "A contract of accord and satisfaction is sufficiently supported by consideration if it settles a monetary claim that is unliquidated in amount." *County Fire Door Corp.* v. *C.F. Wooding Co.*, 202 Conn. 277, 282, 520 A.2d 1028 (1987).

A trial court's determination with respect to whether a claim has been discharged by accord and satisfaction

is a question of fact subject to the clearly erroneous standard of review. *Douthwright* v. *Northeast Corridor Foundations*, 72 Conn. App. 319, 323–24, 805 A.2d 157 (2002); see also *M.J. Daly & Sons, Inc.* v. *West Haven*, 66 Conn. App. 41, 48, 783 A.2d 1138 ("[w]hether a meeting of the minds has occurred is a factual determination"), cert. denied, 258 Conn. 944, 786 A.2d 430 (2001).

Having reviewed the record, we conclude that the trial court's finding that the defendant did not prove its special defense of accord and satisfaction with respect to the second bonus was not clearly erroneous. Even if we assume that the dispute between the parties over the amount owed was in good faith, and that the November 16, 2004 letter from the defendant to the plaintiff constituted an "offer of compromise" in the amount of $8000 and an amended employment contract, the trial court nevertheless found that the plaintiff had not accepted the defendant's offer of accord. Specifically, the trial court found that, although the plaintiff had received an $8000 payment from the defendant; see footnote 8 of this opinion; he "never signed [the proposed employment] contract amendment" and he "did not accept the exact terms of the compromise offered by [the defendant]." Moreover, the trial court credited the plaintiff's testimony at trial that he only "took the $8000 because he was in financial trouble and in no way agreed to that being the full satisfaction of his claim for bonus compensation." Because this factual finding is supported by the record, we decline to disturb the trial court's credibility determination and conclusion with respect to accord and satisfaction. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, supra, 265 Conn. 277–79.

B

The defendant also contends that the trial court improperly rejected its ninth special defense and con-

cluded that the merger clause of the 2005 contract, which replaced the employment agreement, did not operate to "[negate] any claim for a bonus payable after the effective date of the substitute agreement," specifically the third bonus. In response, the plaintiff contends that the substitute contract special defense was "not clearly [pleaded] as such," and that the defendant's briefing at trial "rel[ied] only on the law of accord and satisfaction, not the law of substitute contracts or novations," and was not directed at the February 15, 2005 bonus. The plaintiff also contends that the trial court necessarily rejected this special defense because it found that the 2005 contract had a different scope—namely, his employment after January 3, 2005—and, therefore, "easily subsisted with the wages that vested under the [employment agreement]." We agree with the plaintiff and conclude that the 2005 contract did not affect his rights to compensation under the 2003 employment agreement.

Specifically, the defendant relies on § 6.3 of the 2005 contract, which provides: "This [a]greement contains the entire understanding of the parties. There are no oral understandings, terms or conditions, and no party has relied upon any representative, express or implied, not contained in this [a]greement." The defendant then notes that the 2005 contract eliminated the bonus provision of the employment agreement and further reduced the plaintiff's duties.

"Parties may alter any term of an existing contract by entering into a subsequent contract. . . . The contract as modified becomes a new contract between the parties." (Citation omitted; internal quotation marks omitted.) *Spicer* v. *Spicer*, 33 Conn. App. 152, 159, 634 A.2d 902 (1993), cert. denied, 228 Conn. 920, 636 A.2d 850 (1994). "The meaning to be given subsequent agreements . . . depends on the intention of the parties. As intention is an inference of fact, the conclusion is not reviewable unless it was one which the trier

could not reasonably make." (Internal quotation marks omitted.) *Harris Calorific Sales Co.* v. *Manifold Systems, Inc.*, 18 Conn. App. 559, 564, 559 A.2d 241 (1989).

We agree with the trial court's determinations that the language of the 2005 contract does not refer in any way to "bonuses under the 2003 [employment agreement]," and that, although the defendant could have drafted the 2005 contract in a way that would have required the plaintiff to "forgo his previously earned bonuses in consideration for his new employment contract," it simply failed to do so. Thus, because the language of the 2005 contract did not expressly address the defendant's obligations to pay wages earned during the third bonus period that had ended on December 31, 2004, prior to the effective date of the 2005 contract, we conclude that the trial court properly rejected the defendant's ninth special defense. See, e.g., *Flagg Energy Development Corp.* v. *General Motors Corp.*, 244 Conn. 126, 145, 709 A.2d 1075 (1998) (rejecting contract modification claim because "the language of the 1990 settlement agreement did not . . . supersede or extinguish the warranty obligations contained in the 1987 purchase agreement"); *Spicer* v. *Spicer*, supra, 33 Conn. App. 159 ("[t]he language of the memorandum of understanding when read together with the language of the buy-sell agreement provides sufficient foundation for the trial court reasonably to find that the memorandum of understanding only modified the provisions of the sale of the business clauses without modifying or abrogating the buy-sell agreement in toto").

The judgment is affirmed.

In this opinion the other justices concurred.